# CAPITAL-GAZETTE NEWSPAPERS, INC. *v.*
# RICHARD L. STACK

[No. 53, September Term, 1981.]

*Decided June 4, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE and DAVIDSON, JJ.

*Peter F. Axelrad,* with whom were *David E. Beller* and *Frank, Bernstein, Conaway & Goldman* and *William L. Reynolds* on the brief, for appellant.

*Amicus curiae* brief of the A. S. Abell Company filed. *Douglas D. Connah, Jr., Christopher J. Fritz* and *Venable, Baetjer & Howard* on the brief.

*Russell J. Bennett,* with whom was *David A. Bowers* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court. MURPHY, C. J., concurs in the result, and filed a concurring opinion at page 543 *infra.* COLE, J., dissents and filed a dissenting opinion at page 544 *infra.*

This case concerns an interpretation and application of the principle established in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710 (1964), that in a defamation action a public figure must prove by clear and convincing evidence that the allegedly false defamatory publication was made with "actual malice."

During the 1978 general election, the respondent, Richard L. Stack, was the Republican candidate for election to the Maryland State Senate in District 32, Anne Arundel County. He had never before held public office. He was opposed by H. Erle Schafer, the Democratic candidate. Schafer had previously served as a member of the Anne Arundel County Council and then as Urban Renewal Director for Glen Burnie. The petitioner, Capital-Gazette

Newspapers, Inc. (publisher), was the owner and publisher of two newspapers, the Maryland Gazette and the Evening Capital, both circulated in Anne Arundel County. Edward D. Casey was the executive editor of these newspapers and was responsible for their editorial content. John A. Farrell was then a staff reporter who covered, among other things, the Stack-Schafer campaign. In both the 26 October 1978 edition of the Maryland Gazette and the 27 October 1978 edition of the Evening Capital, identical editorials endorsing Schafer's candidacy were published. Those editorials said:

### "DISTRICT 32

"THIS SENATE race in north county has been the biggest disappointment of any race in the area. What should have been a responsible battle between two intelligent men has turned into one of gutter politics — all because of the tactics of Republican challenger Richard Stack.

"After the smoke of their primary battles had cleared, we expected a race between Stack and H. Erle Schafer, two intelligent, personable candidates who we thought would discuss the issues which would affect the people of this northern Anne Arundel County district.

"Instead, Stack chose to take the low road — a la former Sen. Joseph McCarthy. He has been conducting a campaign of smears and innuendoes in attempting to divide the district's many Democrats.

"Stack has refused to discuss the issues. While Schafer answered the many questionnaires sent out by more than 20 political organizations, Stack not only refused to answer the questions, he demanded that the organizations provide him with Schafer's answers.

"He insinuated that Schafer's Democratic primary opponent, Michael Wagner, was supporting him in the general election. He even said that Schafer's running mate, Del. Tyras Athey, was on his side.

*"Both allegations have proven to be false — as have many other things Stack has said in the campaign.*

"Schafer is a former county councilman and is on leave of absence from his county job as Glen Burnie urban renewal director. He certainly has more experience in government than Stack and from what we have seen in this race is a more responsible human being.

"The overwhelming choice here is Schafer. Stack does not belong in public office." (Emphasis added.)

On 1 November 1978, in the Circuit Court for Anne Arundel County, Stack sued the publisher for libel alleging, among other things, that the publisher had acted with actual malice. In April, 1980, a jury trial was held.

At the trial, much evidence was presented concerning the circumstances preceding and surrounding the publication of the allegedly false defamatory editorial. Stack himself testified that his campaign was premised upon his personal philosophy that a public official should not be obligated to any individual, political group or other special interest group. More specifically, in describing this philosophy, he said:

"A . . . I felt that what the people wanted was a person who was not beholden to anyone once they achieved office. That they owed no one, that they owed no special interest. That they owed no one for an endorsement. They — they owed no group. They owed no campaign manager, they owed no — no one, because if that candidate successfully achieved office, but at the same time had to give something away, in my term, sell out, in order to achieve the office then he was not his own person once he achieved that office. And in my estimation that person was lost before they even started, because they could not be their own person in making the decisions for their constituents. So, we filed — I filed a

campaign based upon that philosophy and that premise.

. . .

"Q [Respondent's Counsel] . . . Now, when you use the phrase, sell out, what do you mean by sell out?

"A I'm talking about making compromises in order to get endorsements, support, raise money, or do anything else that will help toward getting elected. Selling out, or getting these endorsements has always been the — a way of life in Anne Arundel County politics.

"Q But you're not referring to money actually being handed to someone selling out?

"A I'm not referring to money. I'm referring to the fact that this has been the way of politics in Anne Arundel County and in my district, which is located in Anne Arundel County, since I have known anything about politics. And it is my opinion that someone who goes in that way cannot vote as his constituents want him to vote because he owed favors. And I refuse to achieve election that way. I just would not."

According to Stack, campaign strategies consistent with this philosophy were developed. He did not seek the endorsement of politicians or of special interest groups. Although he did not have a platform, he nonetheless discussed issues when attending coffee hours, campaigning door-to-door, participating in debates with his opponent, appearing at candidates' nights, and engaging in press interviews. In addition, he responded to questionnaires submitted to him by newspapers and groups not representing special interests, (i.e., Common Cause and the League of Women Voters). He refused, however, to respond to questionnaires submitted to him by groups representing special interests, (i.e., American Association of Retired Persons, Sierra Club, Metropolitan Baltimore AFL-CIO, Fraternal Order of Police, Maryland and District of Columbia Rifle and Pistol Associa-

tion, Inc., United Christian Citizens, Inc., and Associated Builders and Contractors, Inc.).

The record shows that on 3 October 1978, Stack wrote a letter to Schafer, with copies to Casey, as well as to various reporters, requesting copies of Schafer's answers to the questionnaires submitted to him by groups representing special interests. The letter additionally indicated that Stack would answer the questions posed if they were raised in a different format under different circumstances.

On 19 October and 23 October 1978, Stack placed an ad in the Maryland Gazette and the Evening Capital entitled, "Has Erle Schafer Sold Out?" The text of the ad pointed out that Schafer had answered questionnaires submitted by special interest groups while Stack had not and that "the public was entitled to know what [Schafer] had given away in order to achieve office."

The record further shows that on or about 19 October 1978, in accordance with the newspapers' policy, the publisher held a meeting for the purpose of determining which of the candidates it would endorse. The meeting was called by Casey. At that meeting, Stack, Schafer, Casey, Farrell, and others were present. While Stack discussed some issues at the meeting, he refused to discuss others. Stack asserted that he had the support of Tyras Athey, a Democrat who was then a member of the House of Delegates seeking reelection on Schafer's ticket, and Michael J. Wagner, a Democrat who was then a member of the Maryland State Senate, but who had been defeated by Schafer in the preceding primary. At that meeting, Schafer called Stack a liar and accused him of soliciting support from Democrats.

Casey was disturbed by the fact that two Democrats then in public office might be supporting a Republican in a district that was heavily Democratic and that had never elected a Republican to office. The next day, on 20 October 1978, a second meeting was held at which Schafer, Athey, Wagner, Casey, Farrell, and Patrick Scannello, a Delegate from Glen Burnie, were present. At that time, Athey and Wagner both denied that they were then supporting Stack.

On 21 and 23 October 1978, an article written by Farrell was published in each of the publisher's papers. The article indicated that there was "infighting" in the Democratic Party. It pointed out that although Athey had admitted that he did meet with Stack after "calling the Republican in a fit of post-election emotion," he nonetheless had subsequently reconciled his differences with Schafer and did not intend to help Stack in any way. The article further asserted that the day after the primary, Wagner's secretary had given Stack three photos purporting to show some allegedly dilapidated buildings owned by Schafer, the former Urban Renewal Director. The article further stated that Wagner, "mindful of what happens to Democrats who get caught in the open supporting Republicans," had subsequently reached an understanding with Schafer. The article concluded that Wagner "who began as friend and turned to foe has become a friend again — at least on paper." Finally, the article reported that Stack said he would win because "the Democrats still hurt from the bitter primary and some North County Democrats agree." Farrell wrote the article despite the fact that at the 20 October 1978 meeting Athey and Wagner told him that they were not supporting Stack. Farrell's only explanation for writing the article was that he "just generally [has] to take almost anything a politician says with a grain of salt."

Thereafter, in accordance with the papers' policy, Casey solicited the views of others, including Farrell, and the managing editors of the Maryland Gazette and the Evening Capital, regarding the papers' editorial endorsements. Although Farrell endorsed Stack, the two others whose views were solicited strongly supported Schafer.

On direct examination, Casey testified that before writing the editorial he examined the background and experience of each of the candidates. He reviewed various news stories written during the campaign and considered his own personal observations including the 19 and 20 October 1978 meetings. He evaluated the techniques utilized by the candidates throughout the campaign. He took cognizance of the opinions of those whose views he had solicited. He noted that

Schafer had been a member of the County Council and an Urban Renewal Director, whereas Stack had never previously held public office; that Stack did not have a platform; that he had refused to discuss issues at various times and places; that he had refused to answer questionnaires submitted to him by various organizations; that he had asserted that prominent Democrats were supporting him; that those Democrats had denied the assertion; and that he had utilized an ad designed to vilify Schafer. Based on this information, it was Casey's opinion that Stack had made false statements and had conducted a campaign of smears and innuendos designed to divide the Democrats in the district by "spreading the word that Athey and Wagner were supporting Mr. Stack."

On cross-examination Casey conceded that before writing the editorial his personal knowledge of Stack was limited to what he observed at the publisher's 19 October 1978 candidate endorsement meeting. He additionally conceded that he had not solicited an opinion concerning candidate endorsement from all of the reporters who had covered the campaign, including the reporter primarily responsible for campaign coverage. Indeed, he admitted that the only reporter from whom he solicited an opinion concerning campaign endorsement was Farrell, who had in fact recommended the endorsement of Stack. Casey further conceded that after Athey and Wagner asserted that they were supporting Schafer, not Stack, he did not call Stack for comment. Moreover, Casey admitted that because he believed the assertions of Athey and Wagner, he did not make any effort to investigate the accuracy of Farrell's 21 and 23 October 1978 article indicating that there was "infighting" in the Democratic Party. Additionally, Casey admitted that he did not make any effort to investigate the accuracy of Stack's ad questioning whether Schafer had sold out. Ultimately, the following colloquy took place:

> "Q [Respondent's Counsel] ... I believe you stated in your editorial, both allegations are proven to be false with reference to the allegation of Wagner and Athey's support — *as have many other*

*things that Stack has said in the campaign.* What were the many other things that Mr. Stack said in his campaign that proved to be false?

. . .

"A   I don't know exactly many other things.

"Q   Well, that's what it says. It says, as have many other things.

"A   I'm not finished my answer. I would say that running advertisements, has Erle Schafer sold out. I mean, I think that is certainly a smear and an innuendo. *And in my mind, at least, an untruth. . . .*

. . .

I'm just trying to recall some other things here now. Oh, I would definitely say when he — he tells me to my face that he has the support of Mr. Athey and Mr. Wagner, and then less than 24 hours later these two people tell me to my face that in no way are they supporting him. I think — *I'd have to say that's an untruth.*

"Q   Okay. Now, I let you finish your answer, and I'll go back and ask the question again. I prefaced the question when I asked it with both allegations have proven to be false. The two that you just gave me, with reference to Wagner — with reference to Athey and Wagner. It also says, *as have many other things Stack has said in the campaign.* The other thing you said was an ad that asked a question, has Erle Schafer sold out. Now, I'm asking you, what other things he said in the campaign that proved to be false?

. . .

"A   I cannot be specific any more than I have been on something that happened a year and a half ago. . . . I can't remember anything else at this point." (Emphasis added.)

At the close of all the evidence, the trial court granted the publisher's motion for a directed verdict. Stack appealed to

the Court of Special Appeals which reversed the judgment of the trial court. *Stack v. Capital-Gazette Newspapers, Inc.,* 48 Md.App. 429, 427 A.2d 1066 (1981). The publisher filed a petition for a writ of certiorari that we granted. We shall reverse the judgment of the Court of Special Appeals.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721 (1964), the United States Supreme Court observed that this country has

"a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

Quoting from *Coleman v. MacLennan,* 78 Kan. 711, 724, 98 P. 281, 286 (1908), that Court said:

" '[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counter-balance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small that such discussion must be privileged.' " *New York Times Co.,* 376 U.S. at 281, 84 S.Ct. at 726-27.

In acknowledging the reality of the political milieu in particular, that Court, quoting from Mill, *On Liberty* (Oxford: Blackwell, 1947), at 47, stated:

" '* * * [T]o argue sophistically, to suppress facts or arguments, to misstate the elements of the case, or misrepresent the opposite opinion * * * all this, even to the most aggravated degree, is so

continually done in perfect good faith, by persons who are not considered, and in many other respects may not deserve to be considered, ignorant or incompetent, that it is rarely possible, on adequate grounds, conscientiously to stamp the misrepresentation as morally culpable; and still less could law presume to interfere with this kind of controversial misconduct.'" *New York Times Co.,* 376 U.S. at 272 n.13, 84 S.Ct. at 722 n.13.

The Court recognized that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive.'" *New York Times Co.,* 376 U.S. at 271-72, 84 S.Ct. at 721. Stating that a "defense for erroneous statements honestly made" is essential and that critics of official conduct should not be required "to guarantee the truth of all [their] factual assertions," the Supreme Court established a rule governing recovery of damages in a libel action brought by a public official against critics of his official conduct. *New York Times Co.,* 376 U.S. at 278-79, 84 S.Ct. at 725. Thus, the Supreme Court declared:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.,* 376 U.S. at 279-80, 84 S.Ct. at 726.

Subsequent Supreme Court cases have explicated the standard of "actual malice." Thus, in *Garrison v. State of Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216 (1964), the Supreme Court described "actual malice" as "false statements made with [a] high degree of awareness of their probable falsity." In *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325 (1968), the Supreme Court stated

that publishing with "serious doubts as to the truth of [the] publication . . . shows reckless disregard for truth or falsity and demonstrates actual malice." In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335 n.6, 94 S.Ct. 2997, 3004 n.6 (1974), the Supreme Court reiterated that "subjective awareness of probable falsity" constitutes actual malice. In *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640 (1979), the Supreme Court emphasized that actual malice requires examination of "the conduct and state of mind" of the publisher and a showing that the publisher "must know or have reason to suspect that his publication is false."

In *New York Times Co.,* and its progeny, the Supreme Court not only established the "actual malice" standard, but also considered the proof necessary to support a finding of "actual malice." The existence of actual malice can be established "only on clear and convincing proof." *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008; *see also, Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 83, 88 S.Ct. 197, 199 (1964); *New York Times Co.,* 376 U.S. at 285-86, 84 S.Ct. at 729.

"Actual malice" can be established by showing that: a defamatory statement was a calculated falsehood or lie "knowingly and deliberately published," *Garrison,* 379 U.S. at 75, 85 S.Ct. at 216; *see also, Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 252-53, 95 S.Ct. 465, 470-71 (1974); a defamatory statement was the product of the publisher's imagination; a defamatory statement was so inherently improbable that only a reckless person would have put it in circulation; or the publisher had obvious reasons to distrust the accuracy of the alleged defamatory statement or the reliability of the source of the statement, *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326.

"Actual malice" cannot be established merely by showing that: the publication was erroneous, derogatory or untrue, *Gertz,* 418 U.S. at 340-41, 94 S.Ct. at 3007; *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326; *New York Times Co.,* 376 U.S. at 281, 84 S.Ct. at 726; the publisher acted out of ill will, hatred or a desire to injure the official, *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 10-11, 90 S.Ct. 1537, 1540 (1970); *Garrison,* 379 U.S. at 73-74, 85 S.Ct. at

215; the publisher acted negligently, *Garrison,* 379 U.S. at 79, 85 S.Ct. at 218; *New York Times Co.,* 376 U.S. at 288, 84 S.Ct. at 730; the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory statement, *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326; or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person, *Gertz,* 418 U.S. at 332, 94 S.Ct. at 3003; *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325; *Beckley Newspapers Corp.,* 389 U.S. at 84-85, 88 S.Ct. at 200; *New York Times Co.,* 376 U.S. at 287-88, 84 S.Ct. at 730. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was " 'substantially correct' " and "there was no evidence to impeach the [publisher's] good faith," *New York Times Co.,* 376 U.S. at 286, 84 S.Ct. at 729.

These principles have been frequently reiterated by the Supreme Court. *E.g., Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 163-64, 99 S.Ct. 2701, 2705 (1979); *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 270-71, 91 S.Ct. 621, 624-25 (1971); *Time, Inc. v. Pape,* 401 U.S. 279, 284, 289-92, 91 S.Ct. 633, 636, 639-40, *reh'g denied,* 401 U.S. 1015, 91 S.Ct. 1248 (1971); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 164-65, 87 S.Ct. 1975, 1996 (Warren, C.J., concurring), *reh'g denied,* 389 U.S. 889, 88 S.Ct. 11, 13 (1967). Moreover, they have been adopted and applied in Maryland. *Berkey v. Delia,* 287 Md. 302, 314-18, 413 A.2d 170, 175-77 (1980); *A.S. Abell Co. v. Barnes,* 258 Md. 56, 58-70, 265 A.2d 207, 209-16 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224 (1971).

Applying these principles to the instant case produces a clear result. Here there is no question that the respondent was a candidate for public office and was, therefore, a public figure. *Monitor Patriot Co.,* 401 U.S. at 271-72, 91 S.Ct. at 625; *Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 299, 91 S.Ct. 628, 631 (1971); *A.S. Abell Co.,* 258 Md. at 75, 265 A.2d at 218. Accordingly, the *New York Times Co.* "actual malice" standard applies. Therefore, the respondent had the burden of presenting sufficient evidence from which a trier of fact could find or infer, by applying the clear and

convincing evidence test, that the publisher was aware that its editorial statements were false, or that it published them with reckless disregard of whether they were false. *Berkey,* 287 Md. at 317-20, 413 A.2d at 177-78; *A.S. Abell Co.,* 258 Md. at 77, 265 A.2d at 219.

The record here shows that Casey testified that he was not acting out of ill will, hatred or a desire to injure Stack. Casey had observed Stack at the 19 October 1978 candidate endorsement meeting and, therefore, had some personal knowledge of him. Before writing the editorial, Casey undertook a substantial investigation of the campaign. He examined the background and experience of each of the candidates. He reviewed various news stories written during the campaign. He solicited candidate endorsements from others. He noted that Stack did not have a platform, had on occasion refused to discuss issues, and had on occasion refused to answer questionnaires. He was present when Stack asserted that prominent Democrats were supporting him as well as when those Democrats subsequently denied the assertion. He believed the Democrats and concluded that Stack had made a false statement. He reviewed an ad used by Stack that he believed contained untruths designed to vilify Schafer. All of this evidence shows that Casey acted on a reasonable belief that the statements in the editorial were substantially correct. There was no evidence to impeach Casey's good faith.

The editorial contains a statement to the effect that many things Stack said in the campaign were false. Casey's testimony identifying two specific occasions on which he believed Stack had told untruths served as an adequate basis for this allegedly false defamatory editorial statement. That testimony supports an inference that the allegedly false defamatory editorial statement was not the product of the publisher's imagination and was most assuredly not a calculated falsehood or lie. Indeed, that testimony supports the inference that, under the circumstances, the allegedly false defamatory editorial statement was "no more than rhetorical hyperbole," *Greenbelt,* 398 U.S. at 14, 90 S.Ct. at 1542, often present in vehement debate, and in the

misstatements and misrepresentations ordinarily associated with the political milieu, *New York Times Co.,* 376 U.S. at 270, 273 n.13, 84 S.Ct. at 721, 722 n.13. Thus, the record does not show that Casey was aware of any falsity in the editorial.

While the record shows that Casey did not solicit an opinion from all of the reporters who covered the campaign, did not call Stack for comment after Athey and Wagner asserted that they were supporting Schafer, and did not make any effort to verify either the accuracy of a staff reporter's article relating to infighting in the Democratic Party or of Stack's ad questioning whether Schafer had sold out, the record also shows that Casey made some effort to investigate. At most, Casey's investigatory omissions support a finding of negligence. *Garrison,* 379 U.S. at 79, 85 S.Ct. at 218; *New York Times Co.,* 376 U.S. at 288, 84 S.Ct. at 730. They do not show that Casey acted with reckless disregard of the truth of the editorial statements.

We can only conclude that there was insufficient evidence from which a trier of fact could find or infer that the publisher had a high degree of subjective "awareness of [the] probable falsity" of the editorial statements or that it had "serious doubts as to the truth" of the editorial statements or that it "knew or had reason to suspect" that the editorial statements were false. The trial court did not err when it granted the publisher's motion for a directed verdict. Accordingly, we shall reverse the judgment of the Court of Special Appeals.[1]

> *Judgment of the Court of Special Appeals reversed.*
> *Costs to be paid by respondent.*

---

**1.** In view of our decision, we need not consider the petitioner's remaining contention that its editorial statements were not factual assertions, but rather were constitutionally protected opinion and fair comment.

*Concurring opinion by Murphy, C.J.:*

While I concur with the result in this case, I think the majority has not fully explicated the basis for the decision of the Court of Special Appeals. That court's opinion, in my judgment, merits further discussion.

The Court of Special Appeals held that the evidence before the trial court, when viewed in a light most favorable to Stack, was such that the trier of fact could conclude there was "clear and convincing" evidence of a reckless disregard of the truth or falsity of the statements made in the editorial. The court explained that:

> "Appellee had no explanation for that portion of the editorial wherein Stack was accused of making many other statements in the campaign which had proven to be false. In short, at least so far as that part of the editorial which states 'as have many other things Stack has said in the campaign' is concerned, it would appear that appellee could be found to have recklessly disregarded the truth or falsity of that statement; thus the fact finder could have found actual malice."

*Stack v. Capital-Gazette Newspapers,* 48 Md. App. 429, 437, 427 A.2d 1066 (1981). The Court today lightly glosses over this holding with the assertion that:

> "Casey's testimony identifying two specific occasions on which he believed Stack had told untruths served as an adequate basis for this allegedly false defamatory editorial statement. That testimony supports an inference that the allegedly false defamatory editorial statement was not the product of the publisher's imagination and was most assuredly not a calculated falsehood or lie."

The mere fact that Stack may have lied on two previous occasions did not, as a matter of law, give the publisher *carte blanche* to accuse him of making other false statements, on

the theoretical assumption that if Stack had lied before, surely he would always lie again.

I think the result today is justified because there was no evidence, clear, convincing, or otherwise, that Casey made the allegation with "[a] high degree of awareness of [its] probable falsity," *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325 (1968); or that the allegation was the product of Casey's imagination; or so inherently improbable that only a reckless person would publish it. *Id.* at 732. Casey testified that he viewed the Stack ad, "Has Erle Schafer Sold Out," as being:

> "a smear and an innuendo. *And in my mind, at least, an untruth. . . ."* (Emphasis added.)

While this is only one "other occasion," the record does not indicate that Casey made his statement purely as a matter of whim, or momentary caprice. Indeed, it establishes only that he could not recall every specific reason on which he based his statement, since more than a year and a half had elapsed since the editorial was published. At most, the statement could be characterized as "rhetorical hyperbole." As the majority correctly notes, such hyperbole, in the circumstances of this case, falls within the boundaries of protected speech. It is for this reason that I would reverse the judgment below.

With these additional comments, I respectfully concur in this decision.

*Cole, J., dissenting:*

I dissent. As I see it, the evidence gives rise to a clear jury question.