688 A.2d 535

**Gary W. WAICKER,**

v.

**SCRANTON TIMES LIMITED PARTNERSHIP, et al.**

**No. 782, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 5, 1997.

**622**

Gregory L. VanGeison (James A. Rothschild and Anderson, Coe & King, L.L.P., on the brief), Baltimore, for appellant.

Robert Brager (Laura K. McAfee, Benjamin F. Wilson and Beveridge & Diamond, P.C., on the brief), Washington, D.C., for appellees.

Argued before MOYLAN, HOLLANDER and THIEME, JJ.

THIEME, Judge.

"A word is not a crystal, transparent and unchanged, it is in the skin of a living thought and may vary greatly in color

and content according to the circumstances and the time in which it is used."[1]

Appellant Gary W. Waicker appeals from summary judgment rendered against him by the Circuit Court for Baltimore City (Heller, J., presiding) in the defamation action he filed against appellee, Scranton Times Limited Partnership, which publishes the Baltimore edition of the *City Paper.* In this case we must decide, as a matter of law, whether a real estate investor is a limited purpose public figure and, if so, whether a media defendant who printed allegedly defamatory statements did so with actual malice (knowing the statements were false or making statements with reckless disregard for the truth). We find that Waicker was a limited purpose public figure and that the *City Paper* did not print statements concerning him with actual malice. Accordingly, we shall affirm the judgment of the trial court.

This defamation suit arose from statements made in an article appearing in the *City Paper* on 5 April 1995. The article was entitled "Blockbuster" and concerned the business practices of Gary W. Waicker and his companies, Investment Realty Specialists, Cavalier Realty, and Monopoly Realty.

Waicker does not dispute many of the facts that formed the basis of the article. First, Waicker's businesses purchased and sold real estate primarily in the Patterson Park and Belair–Edison communities in Baltimore City. Second, Waicker's businesses often purchased property and then sold the same property a short time later at a profit.[2] Third, if the new purchaser was an out-of-town investor, Waicker's businesses often managed the property which it had just sold.

---

1. Mr. Justice Holmes, *Towne v. Eisner,* 245 U.S. 418 at 425, 38 S.Ct. 158 at 159, 62 L.Ed. 372.

2. According to Baltimore City land records, in the years 1985 through 1995, Waicker purchased and resold forty-five properties in Belair–Edison. He resold fifteen percent of those properties *on the same day* at an average increase of forty-four percent; he sold forty percent of those properties within six months of purchase at an average increase of fifty percent.

Finally, it is undisputed that since the late 1970's Waicker's practices received attention in the community and the local media.

Reporters for the *City Paper* and Deirdre Shesgreen and Van Smith, the authors of the article at issue, interviewed members of local community organizations [3] and people who purchased property from Waicker's companies. Waicker refused the reporters' request for an interview.

Based on these interviews, the article concluded that Waicker "targets" a particular neighborhood by purchasing properties, and then "rents out some houses and sells others to investors and manages the property for them." According to the *City Paper* article, Waicker sold property by promising potential investors the new tenants would be Section 8 tenants.

Section 8 is the federal rent subsidy program for the poor. Under this program, tenants who could not normally afford to rent property receive monthly supplements which enable them to live in higher rent properties. It is desirable for landlords to rent to Section 8 tenants because the government pays a

---

**3.** The reporters interviewed the following people:  ·
   1. Vincent Qualye, director of St. Ambrose Housing Aid Center, a nonprofit group that works on housing issues, including helping low-income people purchase homes;
   2. Ed Rutkowski, director of the Patterson Park Neighborhoods Initiative;
   3. Christopher Seling, an investor who bought approximately one dozen properties from Waicker;
   4. Gary Gillespie, former director of the Belair–Edison Housing Service, Inc., an organization that provides home ownership counseling, credit counseling, and other housing services;
   5. Tracy Ward Durking, current director of the Belair–Edison Housing Service, Inc.;
   6. William Mosley, a former Waicker property manager and owner of approximately one dozen properties in the area;
   7. Keith Noel, president of the McEldery–Decker Community Association;
   8. Floryne Howard, the housing-assistance payments program officer for Baltimore's Section 8 office;
   9. Several other unnamed sources.

portion of the tenant's rent every month. This assures land-lords of at least partial payment of rent.

Vincent Qualye, director of the St. Ambrose Housing Aid Center (a nonprofit group that works on housing issues) was cited in the article as saying that Waicker's business tactics sparked the beginning of a pattern of decline for a neighbor-hood: when people saw their neighbors moving and selling to absentee landlords or investors, they got worried and were more willing to sell.

Waicker profited on this fear, according to the article's sources, by offering cash to homeowners to sell their houses at deflated prices. A large sign outside his office in Belair–Edison read:

WE PAY CASH FOR HOUSES–FAST CASH.

According to Ed Rutkowski, the director of Patterson Park Neighborhoods Initiative, a neighborhood revitalization pro-ject, Waicker's practices were "almost single-handedly respon-sible for the destruction of East Baltimore."

The article also drew an analogy between Waicker's prac-tices and the despicable "blockbusting" tactics of the 1950's and 1960's. Blockbusting exploited racial bigotry in the fol-lowing manner. A person or company would purchase one home in an all-white neighborhood. After moving an African–American tenant into the newly purchased home, the landlord would try to convince the remaining neighbors to sell by telling them the value of their property would decrease signifi-cantly because of the influx to the neighborhood of African–Americans. This practice is now prohibited by Md.Code Ann., Bus. Occ. & Prof., § 17–608 (1995 Repl.Vol. & Supp.1996).

Waicker brought suit in the Circuit Court for Baltimore City, alleging that the following paragraphs of the article were defamatory:

If Waicker was following the footsteps of the blockbusters, the next step would be to move in a tenant who would worry other neighbors. And although it is hard to prove defini-tively that Waicker tries to find the poorest, loudest, and

most irresponsible tenants he can to move into a new block, those who monitor his activities believe it is the way he operates.

. . .

No one believes Waicker is practicing the same blatant blockbusting tactics that others did in past decades. But at best, critics say, Waicker makes a handsome profit by convincing sellers, sometimes with scare tactics, that their houses are worth less than the true market value, and then persuade buyers to pay more than they should; in that process, he leaves neighborhoods to deal with the loss of home ownership and leads some unsophisticated investors into deep financial trouble. At worst, his critics say, Waicker uses this exploitive practice to make property values in certain neighborhoods plummet—in a manner that is sometimes strikingly similar to the blockbusting of past decades.

. . .

Durkin is more certain of Waicker's attempts to drive down property values. "It is definitely a mode of operating," she says. "He puts lousy tenants in and hangs back and waits for a few more homeowners to drop and makes $15,000 a pop."

. . .

That combination—fewer homeowners, lax investors, deteriorating property, and a demographic shift—can send a neighborhood into a spiral, Qualye says. He and others believe that once a neighborhood begins to decline, Waicker exploits the situation further. Through advertisements and other methods, Qualye says, Waicker plays on the fears of those who worry that their neighborhood is changing racially or economically—and that therefore their property value will drop.

. . .

(Qualye was only one of many community housing activists to make the connection between Waicker and subtle blockbusting.)

. . .

And by using what some have deemed predatory methods and scare tactics to get properties below-market prices, Waicker tends to spread panic in communities and accelerate racial and economic change. He plays on the fears of neighborhood homeowners that the property values will drop and that any demographic shift will bring crime, violence, and other social ills.

After the close of discovery, Waicker moved for partial summary judgment on the grounds that the use of the term "blockbuster" and the representations made by the *City Paper* regarding his business practices were defamatory, and that the newspaper printed the statements knowing they were false or in reckless disregard for their falsity. Scranton Times filed a cross-motion for summary judgment as to the entire action.

After a hearing, Judge Ellen Heller, in a memorandum and order, denied Waicker's Motion for Summary Judgment and granted Scranton Times's Motion for Summary Judgment. Even drawing all inferences in the light most favorable to Waicker, Judge Heller found that he was a limited public figure and that the record did not indicate actual malice, *i.e.,* that the statements were made with knowledge of their falsity or in reckless disregard for the truth.

Waicker presents the following issue for our review.

I. Whether the trial court erred in granting Scranton Limited Partnership's Motion for Summary Judgment on Waicker's claim for defamation.

For the reasons stated below, we shall answer "no" and affirm the decision of the trial court.

## Discussion

The standard of review when dealing with a motion for summary judgment is whether the trial court was legally correct. *Heat & Power v. Air Products,* 320 Md. 584, 591, 578 A.2d 1202 (1990). Maryland Rule 2–501 reads in pertinent part:

(a) Motion.—Any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if filed before the day on which the adverse party's initial pleading or motion is filed.

Our review of the propriety of the trial court's granting of summary judgment focuses on whether there was a dispute as to a material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *See e.g. Bagwell v. Peninsula Regional Medical*, 106 Md.App. 470, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996). A material fact is one the resolution of which will somehow affect the outcome of the case. *King v. Bankerd*, 303 Md. 98, 492 A.2d 608 (1985). In reviewing the record we must resolve all reasonable inferences in favor of the nonmoving party. *Dobbins v. Washington Suburban Sanitary Comm.*, 338 Md. 341, 658 A.2d 675 (1995).

We first must determine whether Waicker is a private plaintiff or a public figure, because "[w]hen the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is [necessary with a private plaintiff]." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986). Whether a plaintiff is a public figure is solely an issue of law. *Embrey v. Holly*, 48 Md.App. 571, 429 A.2d 251 (1981), *rev'd on other grounds*, 293 Md. 128, 442 A.2d 966 (1982); *Fitzgerald v. Penthouse Int'l Ltd.*, 691 F.2d 666, 669–70 (4th Cir.1982), *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983). Appellate courts make a *de novo* review of the entire record when making the determination. *Id.*

The designation of plaintiffs as public figures may rest on two alternative bases: individuals may achieve such pervasive fame or notoriety that they become public figures for all

purposes and in all concepts; or individuals may voluntarily inject themselves or be drawn into a particular public controversy and thereby become public figures for a limited range of issues. *Saint Luke Evangelical Church, Inc. v. Smith,* 74 Md.App. 353, 366–67, 537 A.2d 1196 (1988), *rev'd on other grounds,* 318 Md. 337, 568 A.2d 35 (1990) (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974)); *Jenoff v. Hearst Corp.,* 644 F.2d 1004 (4th Cir.1981) (applying Maryland law). The former is referred to as a general public figure while the latter is referred to as a limited public figure. An example of a general public figure is a famous entertainer or athlete. Waicker clearly did not have the pervasive fame or notoriety to be a general public figure. Our determination is therefore whether he was a limited public figure or a private plaintiff.

■ A court undertakes a two-part inquiry to determine whether a person is a limited public figure: (1) was there a particular public controversy that gave rise to the alleged defamation; and, if so, (2) was the nature and extent of the plaintiff's participation in that particular controversy sufficient to justify public figure status? *See Clyburn v. News World Communications, Inc.,* 903 F.2d 29, 31 (D.C.Cir.1990); Lawrence Tribe, *American Constitutional Law* § 12–13 at 880–81 (2d ed. 1988).

■ A public controversy is a dispute that attracts special attention because its ramifications will be felt by persons who are not direct participants. *Foretich v. Capital Cities/ABC, Inc.,* 37 F.3d 1541, 1554 (4th Cir.1994). Public controversies have "foreseeable and substantial ramifications for non-participants." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–97 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The mere fact that a private concern or disagreement generates news coverage does not mean it is a public controversy, *see Time v. Firestone,* 424 U.S. 448, 459, 96 S.Ct. 958, 967–68, 47 L.Ed.2d 154 (1976); a public controversy is more than a controversy in which the public is interested. *Id.*

In the instant case, real estate speculation and specifically the business practices of Waicker have been the subject of newspaper articles and editorials from the late 1970's to the present. One week prior to the publication of the article at issue in this case, *The Baltimore Sun* ran an article on the subject. Moreover, Waicker's purchase and sale of real estate directly affected the value of the property of community members who were not participants in Waicker's real estate transactions. We have no doubt that real estate speculation in these two Baltimore communities was a public controversy. Because we find that a public controversy existed, we move to the second stage of the analysis: whether the nature and extent of the plaintiff's participation in that particular controversy was sufficient to justify public figure status.

Courts have analyzed the following factors when determining whether an individual is a public figure with respect to an identified public controversy: (1) whether the individual had access to channels of effective communication; (2) whether the individual voluntarily assumed a role of special prominence in public controversy; (3) whether the individual sought to influence resolution or outcome of controversy; (4) whether controversy existed prior to publication of defamatory statements; and (5) whether the individual retained public figure status at the time of alleged defamation. *Fitzgerald,* 691 F.2d at 668; *see generally, A.S. Abell Co. v. Barnes,* 258 Md. 56, 67–68, 265 A.2d 207 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971).

In the instant case, the trial court found that Waicker was a limited public figure with respect to issues involving the purchase and sale of real estate in Baltimore City. Based upon our independent review of the record, we agree.

The first factor is whether the individual had access to channels of effective communication. The rationale for this factor is that when the plaintiff has access to the media, the "public controversy can be aired without the need for litigation and that rebuttal of offending speech is preferable to recourse to the courts." *Reuber v. Food Chemical News, Inc.,* 925 F.2d

703, 708–09 (4th Cir.), *cert. denied,* 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991) (citing *Gertz,* 418 U.S. at 344, 94 S.Ct. at 3009). In *Reuber,* the Court of Appeals for the Fourth Circuit, in finding the plaintiff a public figure, considered that the plaintiff had been interviewed on at least one occasion. In this case, Waicker has sought extensive media attention.

Waicker has been interviewed for newspaper articles since he first became involved with real estate in the late 1970's. One article featured in *The News American* on 30 September 1979, entitled "A local investor: At 26, the 'New Breed' Touch," featured a large photograph of Waicker, sporting a wide grin. In the article, Waicker was quoted as saying:

"Anytime anybody makes a profit today, it's a dirty word. We're not all trouble makers and abusers. I'm not one of those rabblerousers. . . . I think in this kind of story there is a good guy and a bad guy. I'm a good guy."

In a 14 September 1980 *Baltimore Sun* article entitled "Patterson Park real estate conflict simmers: Is it speculation or progress?" Waicker described himself as a "harbinger of better living standards in Patterson Park and of progress in Baltimore housing in general." A picture of Waicker smiling broadly was again prominently exhibited over his quote: "[P]eople are just jealous." Furthermore, Waicker was quoted recently in the 3 April 1995 *Baltimore Sun* article entitled, "Belair–Edison's efforts fail to stop flight to suburbs."[4]

---

**4.** Waicker could have argued that he should not be stripped of his private figure status merely because he responded to accusations of misconduct. A person accused of a *crime* does not lose private figure status merely because he responds to the accusations. *See Foretich,* 37 F.3d at 1558. That is not the case here. First, Waicker has never been accused of committing a crime. He maintains that the article accused him of blockbusting, which is prohibited by statute. The article, however, merely drew an analogy between Waicker's practices and blockbusting. The article specifically says, "No one believes that Waicker is practicing the same blatant blockbusting tactics that others did in past decades." It referred to Waicker's activities as "subtle blockbusting," but never accused him of breaking the law.

Waicker also served as the president and vice president of the Property Owners Association of Greater Baltimore. In those positions, Waicker had the opportunity to influence many decisions made regarding real estate in Baltimore City.

Waicker had access to channels of communication. He put himself in a position to influence political decision and he used the media to refute criticism and portray himself as an honest businessman in order to further his business endeavors. Waicker cannot seek notoriety in order to expand his business enterprises and rebut criticism and then argue he should be given private figure status.

Furthermore, Waicker used the media to attack the positions of what he viewed as a "competitor" —— a non-profit program, the Belair–Edison Housing Service, that sponsored home ownership by buying, rehabilitating, and selling neighborhood homes. The money made by the Housing Service in the sale of a home was used to buy another home, and the process repeated itself. In an article in the *Herald–Observer*, a Baltimore community newspaper, Waicker spoke about those programs:

"Our initial reaction (to the program) was a feeling of helplessness. We were faced with a community association in competition with us. When I first heard about this I testified to the City Council. If the program is done properly, I am behind it, if it's not a smokescreen for racism."

Waicker used the media not only as a shield, but as a sword. We conclude that Waicker used the media to gain notoriety and establish a positive public image to further his business practices. His tactics generated a successful business for

---

Furthermore, the spirit of this principle is inapplicable to this situation. We interpret this principle to prevent the situation in which an individual must choose between either losing private plaintiff status because he defends himself or allowing the public to believe the media's assertions are true because they are undenied. Waicker has sought publicity for the past twenty years, not only to refute criticism, but also to make himself well-known, and to improve his image and, ultimately, his business.

many years. Waicker has reaped many benefits from his public status; he should shoulder the burden.

The second factor, whether the individual voluntarily assumed a role of special prominence in public controversy, and the third factor, whether the individual sought to influence the resolution or outcome of the controversy, are often considered together because of their similarity. *See Reuber*, 925 F.2d at 709. Taken together, these factors reflect a "consideration that public figures are less deserving of protection than private persons because public figures ... have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Id.* (quoting *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2705–06, 61 L.Ed.2d 450 (1979)). Persons are more likely to be limited public figures if they "thrust their personality into the vortex of important public controversy, ... seek[ ] to lead in the determination of public policy, or by being public [persons] in whose public conduct society and the press have legitimate and substantial interests." *A.S. Abell Co. v. Barnes*, 258 Md. at 67–68, 265 A.2d 207.

An entity can become a public figure if it forces itself into the spotlight by seeking public attention through advertising. *National Found. for Cancer Research v. Council of Better Business Bureaus*, 705 F.2d 98 (4th Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). In order to increase sales, Waicker's businesses thrust themselves into the forefront of the public controversy. It was beneficial to Waicker's businesses to have it publicly known that they would pay cash for houses. The businesses prominently displayed a sign that read, in capital letters, "WE PAY CASH FOR HOUSES–FAST CASH." Waicker was known in the community as the owner of the businesses that had the sign. A newspaper advertisement listing the properties Cavalier Realty had for sale featured the phrase "WE BUY HOUSES FOR CA$H!!!"

Cavalier Realty also placed advertisements that had its name in large, capital block letters at the top that read,

"NEIGHBORS—IS THERE A RUNDOWN HOUSE ON YOUR BLOCK WHICH DECREASES YOUR PROPERTY VALUE? CALL U.S. WITH THE ADDRESS." The ad went on to say that Cavalier has won praise from community leaders and (then) Mayor William Donald Schaefer, and wanted to "eliminate the run down houses in your area ... [by] turn[ing] them into fine homes." Similar advertising included Waicker's name.

Furthermore, Waicker thrust himself into public controversy by complaining about the tactics of non-profit organizations that attempted to improve neighborhoods by buying, renovating, and reselling houses. In addition to his complaints regarding the Belair–Edison Housing Service, Waicker complained to the Maryland Real Estate Commission in 1980 that the activities of Madison East End Housing Program[5] were dangerous to the real estate industry, and have not worked with Cavalier Realty while working with other realtors. In so doing, Waicker thrust himself into the heart of public controversy.

In *Waldbaum*, 627 F.2d at 1290, the plaintiff, a supermarket executive, was adjudged a public figure because his activities were reported extensively in trade publications, he was a "mover and shaper of controversial activities," he advocated new policies in the industry, and he oversaw what topics were included in the company's monthly newsletter. Waicker similarly sought to influence the outcome of the public controversy over real estate speculation by advertising aggressively and complaining to regulatory boards about the tactics of (what he considered to be) competitors.

Moreover, Waicker's actions may have started the controversy twenty years ago; he was characterized as "the new breed." The sum of the reasoning underlying the theme of the *Gertz* test (of thrusting oneself into a public controversy) and its progeny is that the key to determining whether a party

---

5. This is a program that sought home ownership development through tenant counseling, loan packaging services, neighborhood organization, as well as rehabilitation of homes and resale.

is a public figure is the party's own conduct. *See National Found. for Cancer Research,* 705 F.2d at 101 (citing *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013). It is only logical to find that a party whose conduct sparked a controversy and fueled it for almost twenty years is a public figure in relation to the controversy.

Waicker could argue that a person should not lose private figure status merely for pursuing business opportunities. We believe, however, that plaintiffs lose private figure status when they advertise aggressively, give interviews to newspapers, and attempt to influence the actions of non-profit organizations. For these reasons, we believe Waicker thrust himself into the controversy; accordingly, his actions met the standard required by the second and third factors of the *Fitzgerald* test.

The fourth factor is whether the controversy existed prior to the publication of the defamatory statement. This test is easily met. The debate over tactics employed by business people to buy and sell residential real estate and its effects on communities began almost twenty years ago and is still a hotly contested issue today; as we noted, one week before the article appeared in the *City Paper,* a similar article appeared in the *Baltimore Sun.*

The fifth and final factor of the *Fitzgerald* test is whether the individual retained public figure status at the time of the alleged defamation. The purpose of this factor is to prevent a person whose public figure status has gone stale from having the increased burden of proof of a public figure.

At the time of publication of the *City Paper* article, Waicker had similar access to the media and continued to thrust himself into the spotlight through the operations of his business. After he received criticism about his large sign (which he eventually removed), a *Baltimore Sun* article that ran a week prior to the article at issue in this case quoted Waicker as saying, "I'm not a scoundrel." We need only look to that fact to conclude that Waicker's status as a public figure was not stale.

In sum, the analysis of the five *Fitzgerald* factors demonstrates that Waicker was a public figure in the dispute over the purchase and sale of residential real estate in the Belair–Edison and Patterson Park sections of Baltimore City. We thus begin the inquiry into actual malice.

■ Before he may recover for defamation, Waicker must prove, by clear and convincing evidence, that the statements in issue were defamatory in meaning, false, made with actual malice, and damages resulted. *Batson v. Shiflett*, 325 Md. at 722, 602 A.2d 1191; *Hepps*, 475 U.S. at 776, 106 S.Ct. at 1563–64; *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). Because Waicker cannot prove actual malice as a matter of law, the trial court properly granted the *City Paper's* Motion For Summary Judgement.[6]

■ "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989). When dealing with First Amendment issues, appellate courts make an independent review of the entire record to ensure the trial court did not intrude on the field of free expression. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958–59, 80 L.Ed.2d 502 (1984).

The actual malice standard was a result of the difficult struggle to "define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." *Hepps*, 475 U.S. at 768, 106 S.Ct. at 1559 (quoting *Gertz*, 418 U.S. at 325, 94 S.Ct. at 3000). The law historically provided a cause of action for damage to a person's reputation by the publication of false and defamatory

---

6. Even taking all inferences in a light most favorable to Waicker, we are unsure whether damages exist, or whether the statements in issue are defamatory or false. We are not required to reach these issues, however, because Waicker was unable to prove actual malice as a matter of law.

statements, *see* L. Eldredge, *Law of Defamation* 5 (1978), but the First Amendment required "breathing space" be afforded to freedoms of expression. *Sullivan*, 376 U.S. at 270–71, 84 S.Ct. at 720–21.

In balancing these competing interests, the Supreme Court held in the seminal case of First Amendment defamation law, *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26, that public officials must prove that defamatory false-hoods relating to their official conduct were made with actual malice, *i.e.*, with knowledge that the statements were false or made with reckless disregard of the truth. *See also Capital–Gazette Newspapers v. Stack*, 293 Md. 528, 538–39, 445 A.2d 1038, *cert. denied*, 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982). That decision was based, in part, on the following logic:

> "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to ... 'self-censorship.' ... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so."

*Sullivan*, 376 U.S. at 279, 84 S.Ct. at 725.

Since *Sullivan*, the Supreme Court further defined the standard of actual malice. The Court of Appeals laid out this standard in *Stack*, 293 Md. at 539–40, 445 A.2d 1038:

> Actual malice *can* be established by showing that: a defam-atory statement was a calculated falsehood or lie "knowingly or deliberately published"; a defamatory statement was the product of the publisher's imagination; a defamatory state-ment was so inherently improbable that only a reckless person would have put it in circulation; or the publisher had obvious reasons to distrust the accuracy of the alleged defamatory statement or the reliability of the source of the statement.

Actual malice *cannot* be established merely by showing that: the publication was erroneous, derogatory, or untrue; the publisher acted out of ill will, hatred, or a desire to injure the official; the publisher acted negligently; the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory statement; or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was "substantially correct" and "there was no evidence to impeach the publisher's good faith." (Citations omitted.) (Emphasis added.)

When these principles are applied to the instant case, we conclude that the trial court correctly granted Scranton Times's Motion for Summary Judgment. Even if we assume that the story was untrue, as we must for the purposes of summary judgment, Waicker still could not prove actual malice. The record does not contain any inferences raised by the undisputed facts that the *City Paper* knew that the contents of its story was false or that it acted in reckless disregard for truth.

In fact the opposite is true; the reporters interviewed approximately ten witnesses and attempted to interview Waicker himself. Because the investigation was so thorough, the *City Paper* did not act in reckless disregard for the truth. There was no evidence that the paper knew that these sources were false. Most of the sources work for or operate long-standing, non-profit, community organizations. Their criticism of Waicker is merely an expression of their opinion and the *City Paper* had no reason to doubt their veracity. The contents of the article were not "so inherently improbable that only a reckless person would have put it in circulation." *Stack,* 293 Md. at 539, 445 A.2d 1038. It certainly is true that the story did not put Waicker in a flattering light, but that is not enough to prove actual malice against a media defendant.

*See Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 10–11, 90 S.Ct. 1537, 1539–40, 26 L.Ed.2d 6 (1960).

There is nothing in the record, even after considering all inferences in a light most favorable to Waicker, to conclude that the *City Paper* had actual malice in printing the story; accordingly, we affirm the decision of the trial court.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**