661 A.2d 1169

CHESAPEAKE PUBLISHING CORPORATION

v.

David M. WILLIAMS.

No. 136, Sept. Term, 1994.

Court of Appeals of Maryland.

July 24, 1995.

David R. Thompson (Cowdrey, Thompson & Karsten, P.A., on brief), Easton, for petitioner.

David M. Williams, Chestertown, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

In this case we must determine whether the evidence presented by Petitioner David M. Williams about an allegedly libelous newspaper article was sufficient to support a defamation judgment against Respondent Chesapeake Publishing Corporation (Chesapeake).

## I.

The defamation action arose out of an acrimonious child custody dispute between Williams and his former wife, Joan B. Turner, which began in 1978. In September, 1984, Turner obtained a temporary custody order from the Juvenile and Domestic Relations District Court for Gloucester County, Virginia, the court stating that it found sufficient evidence "of abuse ... to warrant a[n] ... order allowing [Turner] to retain [her] child's custody temporarily but conditioned upon her immediately filing custody ... or abuse proceedings in the state of Maryland." On September 14, 1984, Turner filed a petition for custody in the Circuit Court for Talbot County, which included allegations of child abuse and an affidavit from police officer Thomas Gross describing an incident of abuse reported to him by the child and his observation of bruises consistent with the child's account. That incident, which became central to the custody proceeding, involved the child's claim that her father, Williams, grabbed her by the arm, tossed her against a wall, and threw a chair at her.

A custody hearing was held on September 17, 1984 and, with consent of the parties, the court (North, J.) met with the child alone in chambers at which time the child repeated her description of the chair incident and expressed her desire to live with her mother. In a written statement summarizing the proceedings, the court decided to leave temporary custody with Turner. Williams nevertheless continued to pursue custody of his child through the winter and spring of 1985, but to no avail.

In May of 1985, dissatisfied with his treatment in the courts, Williams circulated a letter to at least one thousand Talbot County voters, members of the Maryland General Assembly, and others involved in state politics. The letter urged voters to be wary of legislative action that would take away their constitutional right to elect judges to the Maryland circuit court. To demonstrate the need to retain this power, Williams proceeded to detail the facts of his own custody case, describing what he perceived to be improper conduct by Judge North, which, according to Williams, resulted in the court arbitrarily awarding custody of his child to her mother who was unfit. The letter did not mention that he was discussing his own custody dispute nor did it report any of the abuse allegations, which played a major role throughout the proceeding.

In June of 1985, Williams's letter came to the attention of Pat Emory, a reporter employed by Chesapeake. She telephoned Williams and, according to his testimony, informed him that she had received his voter letter and wanted to publish it, but that she needed more information about it first. Williams claims that he only spoke with Emory because he believed that she intended to publish his letter. Williams later testified that he told Emory that the custody dispute described in the correspondence was his own, but that he did not feel that it was necessary, or proper, to say that in the letter. He also said that he told her about the abuse allegations made by his former wife and daughter, explaining that the accusations were false and that, following an investigation, the Department of Social Services chose not to take any official

action with regard to them. As to the alleged chair incident, which he insisted involved no physical abuse and simply amounted to a father disciplining his daughter for lying, Williams told Emory that he "hurt [his daughter's] feelings when [he] disciplined her, which is what [he] intended to do." He maintained that while he may have grabbed his daughter's arm and shook her, he never threw a chair at her. Williams encouraged Emory to verify his story by reviewing the extensive court file pertaining to the custody case.

On June 27, 1985, a newspaper article discussing Williams's letter as well as his custody battle appeared in *The Star Democrat,* a Chesapeake-owned paper published in Talbot County. The same text, with a different headline ("David Williams Initiates Campaign to Reclaim Child"), appeared on July 3, 1985 in the *Kent County News,* a Chesapeake-owned paper published in Kent County. The entire piece read as follows with the allegedly defamatory portions highlighted:

"Attorney Targets Talbot Judge

"A Chestertown lawyer has initiated a one-man letter-writing campaign he says is intended to save Marylanders' constitutional right to elect circuit court judges.

"He said his crusade comes after an unsuccessful, year-long effort to reclaim custody of his daughter, whom a judge removed from his home last year.

"The lawyer, David M. Williams, says he has mailed more than 1,000 copies of a three-page letter detailing the custody case to voters in Talbot County. He says he'll keep mailing the letters 'until they lock me up'.

"The letter urges voters to stand up for their right to elect judges.

" 'You never know when you'll need to exercise your vote in that way, but if it's gone, where do you turn?' Williams asks.

"The letter also targets Talbot County Circuit Court Judge John C. North II. It portrays him as an insensitive judge who removed a child from her father's comfortable

Kent County home and put her with a mother whom Williams depicts as unfit.

"Williams says his daughter is living in a camper on the back of a pickup truck. 'On cold nights she kept warm by using a space heater and sleeping with a dog,' his letter claims.

" *'You wouldn't think they could take my kid away from me for non-existent child abuse,' he said.*

*"Child abuse is not mentioned in the letter. It also doesn't mention that Williams allegedly bruised the girl when he grabbed her, that he threw a chair at her or that he threw her against the wall, all of which he says is true.*

" *'I hurt her a little,' Williams admitted in a recent telephone interview.*

*"A school psychologist describes the child as having 'intense dislike and frustration concerning her father.'*

"Philip Carey Foster, a court-appointed lawyer representing the child, said child abuse allegations made by the mother were never confirmed. Law enforcement agencies also didn't pursue any criminal prosecution.

*"Also unmentioned in Williams' letter are accusations of physical abuse, drunkenness and temper fits, accusations made in court by two wives and Williams' daughter. Williams says the charges were fabricated or occurred long ago.*

"Waller Hairston of Easton, the lawyer for Joan Turner of Virginia, Williams' ex-wife, said, 'I don't think the letter is appropriate by any stretch of the imagination. I don't want to involve the details of that case in the press.'

"Judge North also declined to respond to the letter.

" 'I can't respond in any fashion. My hands are tied by judicial ethics,' North said.

"Another set of judges has essentially answered Williams' charge that North is incompetent. When Williams took his complaints to the Commission on Judicial Disabilities, which can remove a judge from office, the commission completed a

preliminary study and found no reason to continue an investigation against North.

"The custody case has been in almost every court on the Upper Eastern Shore. So much paper has been filed in the case that it stacks 2 feet high in a cardboard box in North's office. Evidence even includes a tooth. Court officials describe the case as the 'perfect television soap opera.'

"Williams' letter has publicized the case, but it wasn't exactly a private matter before then. The director of Kent County's Department of Social Services and several of his employees have been sued by Williams because of their involvement in the case.

"Williams admits that the case has consumed much of his time but would not say how much it has cost him. He said he has spent at least $220 in stamps on the first mailing of 1,000 letters.

"At present, circuit court judges in Maryland are appointed by the governor, then approved or rejected by voters in the next election. North, appointed to the circuit court in 1983, was unopposed and elected to a 15–year term last fall.

"District court judges are appointed by the governor to 10–year terms and do not stand for election.

"Some leaders, including Gov. Harry Hughes, want to relieve circuit court judges of their obligations to stand election. But an effort in that direction failed during last winter's General Assembly session.

"Williams recently ran unsuccessfully against Judge George B. Rasin Jr. of Kent County, chief judge of the Second Judicial Circuit, of which North is a part. Williams claims that race may have prejudiced other judges against him.

"By taking his case to the public, Williams says he hopes to 'correct what I call a cancer. We're losing a little more of our individual rights.'

" 'I'm a hurt person. I'm very disappointed in the system, disappointed that this could happen.'

"North, who has asked the Department of Social Services to find a foster home for Williams' daughter, sees another victim.

" 'The real tragedy of this whole thing is the poor little girl who has been torn one way and another,' he said."

On July 22, 1985, Williams filed suit in the United States District Court for the District of Maryland against multiple defendants. The complaint included a defamation claim against Chesapeake in which Williams alleged that certain statements made in the article published by its subsidiaries were defamatory *per se* in that they accused him of abusing his child in violation of Maryland Code (1957, 1982 Repl.Vol.) Art. 27, § 35A and of committing common law assault and battery.

Chesapeake moved to dismiss the federal court action for lack of jurisdiction. The court allowed limited discovery on the jurisdictional issue, otherwise staying the federal proceedings pending resolution of the ongoing custody litigation in Maryland state court. On December 26, 1990, the federal court granted Chesapeake's motion to dismiss, concluding that there was no factual basis for diversity jurisdiction and no legal basis for pendent jurisdiction in the case. *See Williams v. Anderson,* 753 F.Supp. 1306 (D.Md.1990). Within 30 days of this dismissal, but more than five years after the initial publication of the article in question, Williams re-filed his defamation suit in the Circuit Court for Kent County. Chesapeake moved to have the state court action dismissed as untimely filed, which was denied.

On February 23, 1993, the court granted a motion for partial summary judgment in favor of Chesapeake, determining Williams to be a public figure for purposes of this case.[1] A

---

1. This determination, undisputed on appeal, was based on several factors, including Williams' candidacy for judgeship on the Circuit Court for Kent County in 1978, for state senator from the 36th Election District in 1982, and, most importantly, his correspondence with at least 1,000 voters in Talbot County concerning the election of state court judges. The court concluded that "the letter in question clearly is

jury trial was held and, at the conclusion of Williams's presentation of evidence, Chesapeake moved for judgment pursuant to Maryland Rule 2–519.[2] The court granted the motion, finding that the article, when taken as a whole, was not defamatory. It concluded that the piece contained substantially accurate summaries of matters described in court proceedings, which are conditionally privileged. Moreover, it determined that there was insufficient evidence of actual malice to allow the case to go to the jury.

On August 6, 1993, Williams appealed to the intermediate appellate court, which reversed the circuit court judgment. The court held (1) that the suit was not barred by the statute of limitations in light of the provisions of Maryland Rule 2–101(b), which the court interpreted as requiring a retrospective application;[3] (2) that the elements of defamation were established by the evidence; and (3) that the trial court erred in granting judgment in favor of Chesapeake at the close of

---

purposeful activity on his part amounting to a thrusting of his personality into the vortex of a public controversy.... In writing the letter and in distributing it to 1,000 persons and to the members of the General Assembly, he entered upon a campaign to lead in the determination of policy in this important public matter.... The press, at that point, had a legitimate and substantial interest in the letter and in the comments made by Mr. Williams therein." As a result of his designation as a public figure, Williams was required to prove that Chesapeake acted with actual malice in publishing the allegedly defamatory article. *See A.S. Abell Co. v. Barnes,* 258 Md. 56, 67–68, 265 A.2d 207 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3012–13, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155–56, 87 S.Ct. 1975, 1991–92, 18 L.Ed.2d 1094 (1967).

2. According to Rule 2–519(b), when a motion for judgment is made after the close of the plaintiff's case in a jury trial, the court must consider all evidence and inferences in the light most favorable to the party against whom the motion is made.

3. Rule 2–101(b) states that "if an action is filed in a United States District Court ... within the period of limitations prescribed by Maryland law and the foreign court enters an order of dismissal for lack of jurisdiction, ... an action filed in this State within 30 days after the foreign court's order of dismissal shall be treated as timely filed in this State."

the plaintiff's case. *See Williams v. Chesapeake Publishing*, 101 Md.App. 263, 646 A.2d 1031 (1994). We granted certiorari to consider the important issues raised in this case.

## II.

It is well-settled under both Maryland and federal law that "[t]he First Amendment of the United States Constitution requires that before a public figure may recover for defamation, clear and convincing evidence must establish that the statements in issue were: (1) defamatory in meaning, (2) false, and (3) made with 'actual malice.'" *Batson v. Shiflett*, 325 Md. 684, 722, 602 A.2d 1191 (1992) (citations omitted). *See also Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866 (1992), *cert. denied* —— U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993); *Hearst Corporation v. Hughes*, 297 Md. 112, 120, 466 A.2d 486 (1983).

■ In determining the defamatory quality of a publication, which is a question of law for the court, the article must be read as a whole. *Batson, supra*, 325 Md. at 723, 602 A.2d 1191. We have held: "The threshold question of whether a publication is defamatory in and of itself, or whether, in light of the extrinsic facts, it is reasonably capable of a defamatory interpretation is for the court upon reviewing the statement as a whole; words have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed." *Id. See also Heath v. Hughes*, 233 Md. 458, 464, 197 A.2d 104 (1964); *Hohman v. A.S. Abell Co.*, 44 Md.App. 193, 197, 407 A.2d 794 (1979). As we have stated, "[t]he test is whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction." *Batson, supra*, 325 Md. at 724 n. 14, 602 A.2d 1191.

According to *Batson*, "[a] defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or

dealing with, that person." 325 Md. at 722–23, 602 A.2d 1191. *See also Rosenberg, supra,* 328 Md. at 675, 616 A.2d 866. As to the second criterion, "[a] false statement is one that is not substantially correct. The burden of proving falsity is on the plaintiff; truth is not an affirmative defense." *Batson, supra,* 325 Md. at 726, 602 A.2d 1191 (citation omitted). *See also Metromedia, Inc. v. Hillman,* 285 Md. 161, 169, 400 A.2d 1117 (1979); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 597, 350 A.2d 688 (1976). We have held that "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' " *Batson, supra,* 325 Md. at 726, 602 A.2d 1191 (quoting *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991)).

In Maryland, there exists a qualified privilege to report on legal proceedings, even if the story contains defamatory material, as long as the account is fair and substantially accurate. *Rosenberg, supra,* 328 Md. at 677, 616 A.2d 866. *See also Batson, supra,* 325 Md. at 727, 602 A.2d 1191; *Restatement (Second) of Torts* § 611 (1977). In *Rosenberg,* we held that

> "[o]perating in tandem with the absolute privilege accorded participants in court proceedings is a lesser privilege, alternatively described as qualified, conditional, or special, given to persons who report to others defamatory statements uttered during the course of judicial proceedings.... Reports of in-court proceedings containing defamatory material are privileged if they are fair and substantially correct or substantially accurate accounts of what took place."

328 Md. at 677, 616 A.2d 866. Traditionally, in a defamation action, a qualified privilege will only be forfeited upon a showing of actual malice.[4] *Id.* at 677–78, 616 A.2d 866.

---

4. This is the same standard as is required to prove defamation of a public figure, knowledge of falsity or reckless disregard for the truth. *See infra.* So if a plaintiff fails to meet the burden of proving the presence of actual malice, any conditional privilege that exists will not be overcome and a public figure cannot have been defamed.

*Rosenberg* reveals that, with respect to the fair reporting privilege, however, "[t]he modern view discards the search for malice ... [T]he privilege exists even if the reporter of defamatory statements made in court believes or knows them to be false; the privilege is abused only if the report fails the test of fairness and accuracy." *Id.* at 678, 616 A.2d 866. (citations omitted). *See also Restatement (Second) of Torts* § 611 (1977). Finally, "[t]he fair reporting privilege reaches not only comprehensive accounts of judicial proceedings, but [also] accounts focusing more narrowly on important parts of such proceedings." *Rosenberg, supra,* 328 Md. at 682, 616 A.2d 866.

█ Finally, in order for a person to be held liable for defaming a public figure, actual or constitutional malice must be shown. Proving actual malice requires "clear and convincing evidence that a statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Batson, supra,* 325 Md. at 728, 602 A.2d 1191 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)). *See also Hearst, supra,* 297 Md. at 120, 466 A.2d 486; *Capital–Gazette Newspapers v. Stack,* 293 Md. 528, 538, 445 A.2d 1038, *cert. denied,* 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (extending the *New York Times* rule to public figures).

█ We have held that "while 'reckless disregard for the truth' is not easily defined, it does mean having either [a] 'high degree of awareness of ... probable falsity' or 'entertain[ing] serious doubts' as to the truth of the challenged statements." *Batson, supra,* 325 Md. at 729, 602 A.2d 1191 (citing *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 2685–86, 105 L.Ed.2d 562 (1989)). *See also Gertz, supra,* 418 U.S. at 334–35 n. 6, 94 S.Ct. at 3004 n. 6; *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968); *Garrison v. Louisiana,*

379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964). We have further held that

> " '[a]ctual malice' cannot be established merely by showing that: the publication was erroneous, derogatory or untrue, the publisher acted out of ill will, hatred or a desire to injure the official, the publisher acted negligently, . . . or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was ' "substantially correct" ' and 'there was no evidence to impeach the [publisher's] good faith.' "

*Batson, supra,* at 729, 602 A.2d 1191 (quoting *Capital–Gazette, supra,* 293 Md. at 539–40, 445 A.2d 1038 (citations omitted)). On the other hand,

> " '[a]ctual malice' can be established by showing that: a defamatory statement was a calculated falsehood or lie 'knowingly and deliberately published[;]' a defamatory statement was the product of the publisher's imagination; a defamatory statement was so inherently improbable that only a reckless person would have put it in circulation; or the publisher had obvious reasons to distrust the accuracy of the alleged defamatory statement or the reliability of the source of the statement."

*Capital–Gazette, supra,* 293 Md. at 539, 445 A.2d 1038 (citations omitted). The burden is on the plaintiff to prove the existence of actual malice by clear and convincing evidence. *Batson, supra,* 325 Md. at 728, 602 A.2d 1191. *See also Capital–Gazette, supra,* 293 Md. at 540–41, 445 A.2d 1038; *Berkey v. Delia,* 287 Md. 302, 318–20, 413 A.2d 170 (1980); *A.S. Abell Co. v. Barnes, supra,* 258 Md. at 77, 265 A.2d 207.

## III.

Williams points to five specific statements in Chesapeake's article, which he claims are defamatory in that they accuse him of felonious child abuse and of common law assault and

battery. We shall consider each of these contentions after making our own independent examination of the record in the case, as the governing law requires. *Batson, supra,* 325 Md. at 722, 602 A.2d 1191. *See also A.S. Abell Co. v. Barnes, supra,* 258 Md. at 72, 265 A.2d 207 (stating that "[w]e must 'make an independent examination of the whole record,' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression"); *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 508–11, 104 S.Ct. 1949, 1963–65, 80 L.Ed.2d 502 (1984) (reiterating the importance of independent appellate review in First Amendment cases); *Time, Inc. v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 636–37, 28 L.Ed.2d 45 (1971); *New York Times, supra,* 376 U.S. at 284–85, 84 S.Ct. at 728–29.

First, we shall assume, without deciding, that Williams's defamation suit was timely filed in state court. Accordingly, we will decide the case on its merits. Because we are reviewing a grant of a motion for judgment in favor of Chesapeake, we must consider the evidence in the light most favorable to Williams and determine whether he presented clear and convincing evidence, which would allow a reasonable fact-finder to conclude that the article in question contained statements that were defamatory, false, and made with actual malice. *Masson, supra,* 501 U.S. at 508, 111 S.Ct. at 2428. *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), concluding that:

> "the inquiry involved in a ruling on a motion for ... [judgment] necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.... [Therefore], where the First Amendment mandates a 'clear and convincing' standard, the trial judge in disposing of a [motion for judgment] should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity."

As we have duly noted, the publication here at issue is a newspaper article, discussing the letter Williams sent to Maryland voters and what the reporter determined to be Williams's

impetus for doing so, namely his unsuccessful battle for custody of his child. The information and opinions expressed in the article were based upon a comprehensive review of the court file in the custody dispute and interviews with various participants in the case. We believe that the publication, if taken as a whole, is a fair and substantially accurate account of what has clearly been a protracted and complex court proceeding. When read in its entirety, the reporter's presentation is objective, offering Williams's views, the perspectives of others involved in the case, and her own observations of the events surrounding this high profile custody battle.

■ The first allegedly libelous paragraph reads: " 'You wouldn't think they could take my kid away from me for nonexistent child abuse,' he said." The second paragraph states: "Child abuse is not mentioned in the letter. [The Williams letter] also doesn't mention that Williams allegedly bruised the girl when he grabbed her, that he threw a chair at her or that he threw her against the wall, all of which he says is true." While the second paragraph is arguably defamatory if taken on its own, when read in conjunction with the preceding statement, it is clear that Emory acknowledges that Williams denied ever having abused his child. It is beyond reason that she would print Williams's denial of the abuse charges in one sentence and then immediately attempt to suggest that he admitted to such allegations in the next paragraph. Therefore, we conclude that her comment pertaining to Williams's recognition of the truth of the statements in the second paragraph must have been intended to convey that Williams conceded that neither the subject of child abuse in general nor the specific allegations about the chair incident were mentioned in his letter, which is true, and not that he confessed to harming his child. Further evidence that Emory treated the abuse charges as unsubstantiated is that, just following these allegedly defamatory statements, she writes that even the child's court-appointed attorney conceded that the abuse allegations were never confirmed and that no criminal prosecution was pursued. In keeping with this, we cannot conclude that

the article intended to suggest that Williams confessed to abusing his child.

■ The next paragraph reads: " 'I hurt her a little,' Williams admitted in a recent telephone interview." Williams testified that he never told Emory that he physically hurt his daughter, as he claims this statement implies; instead, he insists that what he actually said was "I hurt [my daughter's] *feelings* when I disciplined her, which is what I intended to do." We do not believe that this alleged misrepresentation of Williams' comment on this subject amounts to an accusation of criminal conduct as he contends. This is especially true since the statement does not actually say that Williams admitted to physically harming his child, which is consistent with his previous denial of the abuse earlier in the article. Furthermore, we conclude that the gist of the quotation as written is not substantially different from what Williams claims to have actually said.

■ The fourth statement that Williams complains about states that "[a] school psychologist describes the child as having 'intense dislike and frustration concerning her father.' " This assertion is true and true assertions, no matter how damaging to a plaintiff's reputation, can never provide the basis for a defamation action. Material found in the court file supports Emory's comments in this regard and are, at least, substantially correct. One document states: "[Lori] experiences considerable anxiety and fearfulness, much of which appears associated with her relationship with the paternal figure towards whom she evidences intense rage at the present time."

■ The final paragraph that Williams is challenging states: "Also unmentioned in Williams' letter are accusations of physical abuse, drunkenness and temper fits, accusations made in court by two wives and Williams' daughter. Williams says the charges were fabricated or occurred long ago." These statements are also true, which was conceded by Williams at trial; however, he claims that Emory should have also written that these allegations had, in his opinion, been determined to be

unfounded in earlier court proceedings. To do so, however, was not the reporter's obligation.

The factual material pertaining to the custody dispute, which was used by Emory in writing her article, including the information about the psychologist reports and the prior allegations made against Williams by his family members, came from the court file in the case. Such material is protected by a qualified privilege, which can only be forfeited if the reporter's account of the legal proceeding in question fails to be fair or substantially accurate, neither of which is true in the instant case.[5]

Finally, even if we assume that some of the allegedly libelous statements in this case are both defamatory and false, after a careful review of the record, we conclude that there was not a sufficient showing of actual malice to send this case to the jury. In fact, the only evidence of actual malice presented by Williams at trial was his testimony that Chesapeake published the libelous article because he had represented clients against the publisher in the past, albeit unsuccessfully, and the CEO of the corporation was annoyed at the extent to which the litigation had dragged on. Evidence was also presented, however, establishing that Williams has often felt conspired against in this nature in the past, which is evidenced by the numerous, unfounded lawsuits he has brought against virtually every person involved in his daughter's custody case.[6] In fact, Williams brought a defamation claim against KCDSS and its director in which he made

5. The traditional view posits that actual malice is needed in order to overcome the fair reporting privilege; however, we need not express a preference for a particular standard in this case because Chesapeake would be protected under either one since the record is barren of any evidence that it acted with malice in publishing its article about Williams.

6. Williams has sued five Maryland circuit court judges, a judicial law clerk, his ex-wife's attorney, his daughter's court-appointed attorney, several social workers, the director of the Kent County Department of Social Services (KCDSS), four county governments, and his ex-wife among others.

virtually identical allegations on the issue of actual malice as the ones we are reviewing in the instant case. The suit claimed that the defendants were motivated by spite and ill will directed towards him because, in 1981, he had represented a case worker against them in an employment dispute. We do not accept Williams's conclusion that Chesapeake was retaliating against him for bringing lawsuits against it in the past in his capacity as an attorney.

Williams also contends that when Emory misquoted him about whether he "hurt" his daughter in the chair incident, her actions constituted actual malice. The Supreme Court has made the following observations about improper quotations:

> "In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim.... A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because it attributes an untrue factual assertion to the speaker.... Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold."

*Masson, supra,* 501 U.S. at 511–12, 111 S.Ct. at 2430. The Court held that "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co.* ... and *Gertz* ... unless the alteration results in a material change in the meaning conveyed by the statement." *Id.* at 517, 111 S.Ct. at 2433. In the instant case, there was not clear and convincing evidence that the inaccuracy of the quote in question was deliberate and, furthermore, after comparing the language attributed to Williams with the statements that he admitted to making, we conclude that the meaning of his intended statement was not materially changed by Emory's alteration; the quote would likely have the same effect on a reader either way it was written.

Finally, Williams contends that because he explained to Emory his version of what occurred with regard to the events surrounding his custody dispute, the reporter acted with knowledge of falsity and/or reckless disregard for the truth when she printed an article that presented other sides of this complicated story. We do not think that a reputable reporter would accept, at face value, the facts of a story from a single participant without further investigation. Emory simply did her job; she looked into what Williams told her and gave a full account of what she uncovered. Therefore, applying the principles set forth in *Batson,* we conclude that there was no evidence that Chesapeake had either a high degree of awareness of the probable falsity of any of the statements made in the article in question or that it entertained any serious doubts as to the publication's truth. In fact, the evidence shows that Chesapeake acted on a reasonable belief that the statements in its article were substantially correct and nothing was presented to impeach its good faith. Accordingly, employing the requisite clear and convincing evidence standard, we find insufficient proof of actual malice upon which to find Chesapeake liable for defamation and, therefore, hold that the case was properly withheld from the jury.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID BY THE RESPONDENT.*

Concurring Opinion by CHASANOW, BELL and RAKER, JJ.

Judges CHASANOW, BELL, and RAKER concur in the result only because we believe the action is barred by the statute of limitations. Maryland Rule 2–101(b) should not be applied retrospectively to toll limitations where the time for filing the action has run years before the tolling rule was adopted by this Court in 1992.