968 A.2d 1084

**John GRADY, et al.**

v.

**Darin Donell BROWN.**

**No. 85 Sept.Term, 2008.**

Court of Appeals of Maryland.

April 7, 2009.

Reconsideration Denied April 20, 2009.

Irwin E. Weiss, Baltimore (Richard M. Bader of Bader & Cooper, Baltimore), on brief, for petitioners.

Brief amicus curiae of the Maryland Ass'n for Justice: John B. Bratt, Esquire, Miller & Zois, LLC, Glen Burnie, for petitioners.

Sara H. Deriu (Mark R. Brown of H. Barritt Peterson, Jr. & Associates, Towson), on brief, for respondent.

Argued Before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY and IRMA S. RAKER, (Retired, specially assigned) and ALAN M. WILNER (Retired, specially assigned), JJ.

IRMA S. RAKER, Judge (Retired, specially assigned).

This motor tort case involves the Boulevard Rule. We must decide whether the Circuit Court for Baltimore City erred in denying petitioners' Motion for Judgment Notwithstanding the Verdict on the grounds that, based on the Boulevard Rule, respondent's operation of his vehicle was negligent as a matter of law. The Court of Special Appeals affirmed, as shall we.

## I.

This case arises from a motor vehicle accident which occurred on the morning of March 16, 2005, on Falkirk Road near the intersection of Gittings Avenue in Baltimore City. Petitioner Grady and his wife, Jacqueline Grady, filed an action sounding in negligence against respondent Brown and his father, Vern Milton Brown.[1] Grady was operating his motorcycle on the favored highway, Falkirk Road, and Brown was operating a motor vehicle on the unfavored highway, an alley leading into Falkirk. Grady alleged that Brown was negligent in that he failed to grant the right-of-way to Grady and failed to observe Grady's vehicle in time to avoid a collision.

---

1. Jacqueline Grady asserted a loss of consortium claim, and her liability claim was the same as that of her husband. Vern Milton Brown's participation as a defendant was as the owner of the vehicle operated by his son. The trial court granted Vern Milton Brown's Motion for Summary Judgment in March of 2006 and he was therefore not a party at trial.

The case proceeded to trial before a jury in the Circuit Court for Baltimore City. Prior to trial, the parties agreed that if Brown was liable to Grady, the amount of damages due was $50,000. Liability was the only issue in dispute, and hence, that issue was the only issue presented to the jury. We set forth the facts in great detail because the parties do not agree as to how the accident occurred.

On the morning of March 16, 2005, John Grady was operating his motorcycle north on Falkirk Road. Falkirk Road is a two lane roadway, with one lane for northbound traffic and one lane for southbound traffic. Parking is permitted on both sides of Falkirk Road. Grady described Falkirk Road as follows:

"It's a two way street. It's basically concrete slabs. You have enough room for parking two cars and then gingerly going slowly past each other in traffic and if you have a larger truck though you have to kind of like pull in so somebody can get by . . . ."

According to Grady's testimony, his route on Falkirk Road involved several stop signs, including a three-way stop sign at Gittings Avenue and, "two lengths of a house" past Gittings, a four-way stop sign at Walker Avenue. The accident took place at the intersection between Falkirk Road and an unnamed alley located between Gittings Avenue and Walker Avenue. Respondent does not dispute these facts.

Grady testified that he accelerated at about fifteen miles per hour in second gear as he proceeded from the stop sign at Gittings Avenue. As he approached the alleyway before Walker Avenue, he testified that he "got a glimpse of a green car coming out of the alley." He then described the accident as follows:

"Q: And what did you next observe, what next happened?

A: Well, you know, I expected it to stop and it didn't.

Q: Okay. So the vehicle did not stop?

A: No, sir.

Q: Did the vehicle come out into the intersection, out onto Falkirk?

A: Yes, sir, as I was getting closer to it, it just kept coming out until I saw the entire hood of the car coming at me.

\* \* \*

Q: Now, as that vehicle pulled out, what, if anything, did you do?

A: Pulled my clutch in and hit the brakes and the horn at the same time.

\* \* \*

A: ... Hit the foot brake which stopped the bike very quickly and pulled the right hand brake also. The bike was pretty much stopped. I was trying also to turn to the left to avoid him hoping he was going to see me and there was still enough room to go around.

Q: Was this vehicle moving at impact?

A: Yes, sir.

Q: Now, did you observe the driver of the vehicle?

A: Yes, sir, I did.

Q: What direction was his head facing?

A: His head was looking away from me, sir. He never saw me.

Q: Could you tell from the position of his vehicle whether or not he was going to make a left turn or a right turn?

A: He was turning left, sir.

\* \* \*

Q: Now, how fast—you said you were almost stopped at impact. Do you know—can you estimate the speed of the bike?

A: It would be very hard to do so, sir, but between—I mean if you got 150 feet before your next four way stop sign you're not going to be going very quick.

Q: Well, I know you said you were doing about fifteen miles an hour at the most but at the impact how fast were you going?

A: Probably down to five.

Q: And what happened at impact?

A: Well—

Q: What part of your bike struck what part of the vehicle?

A: His vehicle basically hit the front right of my vehicle. It would have been the front right rotor, the brake, and the hand brake and then turned the wheel even further which causes everything to go to your left.

\* \* \*

Q: ... Now, how wide was the pickup truck that was parked adjacent to the alley where Mr. Brown came out of?

A: It's a full size. I would say it's about five, five and a half feet.

Q: And how close to that parked vehicle where you driving?

A: I was in the middle of my lane.

Q: Well, let me ask you again. Then how far would that put you away from the, away from the parked car?

A: About three feet.

Q: You were basically out in the middle of your lane towards the center of the road?

A: Yes, sir."

On cross examination, defense counsel elicited additional information from petitioner Grady regarding the parked pickup truck and the point of impact.

"Q: Okay. Now, as I understand your testimony, sir, that it was a pickup truck parked to your right just prior to the alley my client was exiting, true?

A: Yes, sir.

Q: Okay. Now, other than that pickup truck there was nothing obstructing your view of the alley, correct?

A: There were cars all along the street, sir.

Q: But nothing obstructed your view of my client's vehicle exiting that alley with the exception of the pickup, correct?

A: Like I said, sir, there were cars parked on both sides of the alley and on the left side of the street all of the way up

to the alley. I did see it coming. I thought it would stop but it didn't.

Q: Now, my understanding that for a brief period about five feet that you were traveling, you lost my client's vehicle because of that pickup truck; is that right?

A: No, sir, I basically saw your client's vehicle coming around the pickup truck.

Q: Okay. But just prior to that by your testimony there was a brief period of time when you lost vision of my client's vehicle, correct?

A: Yes, sir. Yes, he would have lost it, yes, sir.

Q: Okay. Now, you claim that my client pulled beyond that pickup truck into the through lane you were traveling, right?

A: Yes, sir.

\* \* \*

Q: All right, now, when you testified that my client came into your direction of travel you indicated his vehicle was positioned as if he was about to make a left turn, right?

A: Yes, sir.

Q: Okay. And when you saw his vehicle you said at that point it was still moving at that point, correct?

A: Yes, sir.

Q: You testified that it was still moving at the time of contact between your motorcycle and his vehicle, right?

A: Yes, sir.

\* \* \*

Q: Is it your testimony that's where the impact occurred?

A: The impact would have been right here, sir.

Q: Right at the center line?

A: Yes, because I would have been veering to the left.

Q: And so by your testimony my client's vehicle would have been turning left, right?

A: He was pulling out and turning left, yes, sir.

Q: And again despite his turning left, as I understand it, somehow you grazed, your vehicle grazed the front of his vehicle and took off the license plate?

A: That is correct, sir. Much safer to try and get away from a car than to go over it.

Q: I appreciate that, sir. Having said that when you first saw my client's vehicle, his whole hood area by your testimony was in your lane of travel, isn't that correct?

A: Yes, sir, it was.

Q: And yet despite his going to the left you didn't strike the driver's side of his car?

A: No, sir, I was locking up my brakes. I was hitting the horn. I was pulling the clutch in and I was veering to the left to get into that other lane. Hopefully he would see me stop and I could have gotten around him.

Q: Sir, if you're doing less than fifteen miles an hour, why weren't you able to stop your vehicle?

A: I believe it's cause your client came out and never stopped, sir, that I had no chance to stop my vehicle."

Respondent Brown testified and provided a different version of the accident on direct examination:

"Q: Could you tell the jurors what you did that morning just prior to the occurrence? Lead them up to the impact, the time the occurrence took place?

A: You mean when I got up this—

Q: When you got up and left the house. From the time you left the house?

A: Oh, when I left the house I warmed the car up. You know, it was pretty cold that morning and I backed out of the alley and I proceeded down the alley to Falkirk. I guess I was going about twenty, maybe fifteen down the alley, and as I got to the end of the alley, I stopped at the alley and then I inched out to the edge of the car, and that's when whatchama call it, Mr. Grady, that's when he slid. He came down the street. He skidded. I guess he skidded for about eight, about eight feet and then his bike hit the

ground and slid more. You know, he was going pretty fast, and that's when he grazed across my front bumper.

Q: Could you describe to the jury, you said there was a car there, what are you talking about?

A: There was a vehicle to my left, yeah.

Q: Where in terms of—

A: A parked vehicle, yeah.

Q: Where in terms of that parked vehicle was the front of your vehicle when this incident occurred, meaning the actual grazing of your license plate?

A: I was even with that vehicle. I might have been behind it a little bit.

Q: Did you ever see the plaintiff's motorcycle before this incident occurred?

A: Yeah, I saw it and I heard him.

Q: About how far away from you was he when you first noticed him on Falkirk Road?

A: Let's see, I saw him about, I guess about two car lengths.

Q: And how long were you stopped before the impact with your vehicle occurred?

A: Let's see, I give it five to ten seconds.

Q: Was any part of your vehicle protruding into the through lane, the northbound lane in which plaintiff was traveling?

A: No.

Q: At any time prior to this incident occurring was any portion of your vehicle extended into the through lane where plaintiff was traveling?

A: No, like I said, I never went past the parked car.

Q: What was it your intention to do when you brought your vehicle to a stop?

A: I was going to make the left turn onto Falkirk.

Q: At that time did you know that the motorcycle was on Falkirk?

A: Yeah, uh-huh, I saw him.

Q: Okay. And you heard plaintiff testify that you pulled directly into his path, correct? Did you hear that?

: Yeah, I heard it.

Q: Is that true?

A: No, that's false.

* * *

Q: Were you able to observe his vehicle long enough based on your experience as a motor vehicle operator to see how fast he was traveling onto Falkirk prior to the occurrence?

A: He was going pretty fast. Like I say, you know, he locked them up and he left some rubber on the ground and after he hit he skidded. So I give him at least thirty, thirty-five. It definitely wasn't fifteen.

Q: Do you know what the speed limit is in that area?

A: I saw about twenty-five."

Respondent maintained that his vehicle did not protrude beyond the parked pickup truck on Falkirk Road and that his car was either even or maybe a little less than even with the parked vehicle. On redirect examination, respondent was asked to elaborate on the position of his car relative to the parked truck.

"Q: I'm going to show you what's been marked for identification and moved into evidence as plaintiffs 2–F and ask if you see in that photograph any markings on the roadway indicating where vehicles parked?

A: All right, there is these white lines here, right here where the parking spaces are.

Q: Okay. Do you know if the width of that vehicle, the one that Mr. Bader has described as a truck, extended beyond that white line?

A: No, it didn't go beyond that line, no.

Q: Was your vehicle ever beyond that white line?

A: No."

The court submitted the case to the jury. On a special verdict sheet, the jury found that respondent was not negligent.[2] The Circuit Court denied petitioners' Motion for Judgment Notwithstanding the Verdict or in the alternative a Motion for New Trial.

Petitioners noted a timely appeal to the Court of Special Appeals. The Court of Special Appeals affirmed the Circuit Court, holding that although respondent was in the boulevard, because he was on the improved portion of the favored highway, he did yield the right-of-way to Grady, the favored driver. *Grady v. Brown*, 180 Md.App. 367, 376, 951 A.2d 105, 110 (2008). The court reasoned as follows:

"Crucial to the above conclusion is the fact that, according to Brown's version of the events, at no point did Brown block or otherwise intrude into the path that the favored driver had been following prior to the point that Brown's vehicle came to a stop. This makes this case unlike any of the many Boulevard Rule cases that have been decided against the unfavored driver by appellate courts of this state."

*Id.*

We granted certiorari to consider the following question:

Did the Court of Special Appeals err in finding that a jury question was presented as to the negligence of the Defendant, even though the Court of Special Appeals acknowledged that the Plaintiff below was the favored driver on the boulevard, the Defendant was the unfavored motorist, and also finding that the Defendant did drive his vehicle onto the roadway?

*Grady v. Brown*, 406 Md. 112, 956 A.2d 201 (2008).

## II.

The Boulevard Rule requires the following:

---

**2.** Because the jury found that Brown was not negligent, it did not address the second question on the verdict sheet, *i.e.,* was Grady contributorily negligent.

"[A] driver upon approaching a 'through highway' from an unfavored road must stop and yield the right of way to all traffic already in or which may enter the intersection during the entire time the unfavored driver encroaches upon the right of way; [and] this duty continues as long as he is in the intersection and until he becomes a part of the flow of favored travelers or successfully traverses the boulevard."

*Creaser v. Owens,* 267 Md. 238, 239–40, 297 A.2d 235, 236 (1972). The purpose of the rule is to "accelerate the flow of traffic over through highways by permitting travelers thereon to proceed within lawful speed limits without interruption." *Belle Isle Cab Co. v. Pruitt,* 187 Md. 174, 179, 49 A.2d 537, 539 (1946); *see also WMATA v. Seymour,* 387 Md. 217, 227, 874 A.2d 973, 979 (2005). Thus, the Boulevard Rule requires the unfavored driver to do two things: (1) stop before entering the favored highway and (2), yield to all traffic within the intersection during the entire time the driver is either crossing the highway or is merging into the traffic.

The Boulevard Rule has long been codified in Maryland. Presently, the law is codified in several sections of the Transportation Article of the Maryland Code (1977, 2006 Repl. Vol.), including § § 21–403, 21–404, and 21–705(c). Most relevant to the circumstances in the case *sub judice,* § 21–705(c) states as follows:[3]

---

3. Section 21–403 provides:
 "(b) *Stopping at entrance to through highway.*—If the driver of a vehicle approaches a through highway, the driver shall:
 (1) Stop at the entrance to the through highway; and
 (2) Yield the right-of-way to any other vehicle approaching on the through highway."
 Section 21–404 provides:
 "(a) *Entering highway from other than a highway—Duty to stop.*—The driver of a vehicle about to enter or cross a highway from a private road or driveway or from any other place that is not a highway shall stop.
 (b) *Same—Yielding right-of-way.*—The driver of a vehicle about to enter or cross a highway from a private road or driveway or from any other place that is not a highway shall yield the right-of-way to any other vehicle approaching on the highway."

"(c) *Yielding right-of-way to other approaching vehicles.*— The driver of a vehicle emerging from an alley, driveway, or building shall on entering the roadway, yield the right-of-way to any other vehicle approaching on the roadway."

Section 21–101(t) defines "right-of-way" as follows:

" 'Right-of-way' means the right of one vehicle or pedestrian to proceed in a lawful manner on a highway in preference to another vehicle or pedestrian."

Section 11–151(a) defines "roadway" as follows:

" 'Roadway' means that part of a highway that is improved, designed, or ordinarily used for vehicular travel, other than the shoulder."

 The *Creaser* Court reviewed more than fifty opinions of this Court which had considered the Boulevard Rule, and concluded that "in none has there been any suggestion that the topography of an area which limits an unfavored driver's view of travelers on the favored highway would relieve him of the heavy responsibility placed on him by the stringent requirements of this law." *Creaser, supra,* 267 Md. at 243, 297 A.2d at 238. The same holds true for the effect of speed, time or distance of the driver. *See Greenfeld v. Hook,* 177 Md. 116, 126, 8 A.2d 888, 893 (1939). The Court in *Creaser* made clear as follows:

"[W]e emphasize that if an unfavored driver is involved in an accident with a favored vehicle under circumstances where the boulevard law is applicable then in a suit based on that collision the unfavored driver is deemed to be negligent as a matter of law. And, if the unfavored driver is a plaintiff, his suit is defeated unless the doctrine of last clear chance rescues his claim. Whereas, if the unfavored driver is a defendant he is liable except in the rare case when the issue of contributory negligence on the part of the favored driver is properly submitted to a jury, *i.e.,* whether he was guilty of negligence that was a proximate cause of the accident."

*Creaser, supra,* 267 Md. at 245, 297 A.2d at 239 (internal citations omitted).

Petitioners' position before all three courts is that respondent caused the accident by entering onto the favored highway in violation of the Boulevard Rule. Before this Court, petitioners argue that the Court of Special Appeals erred in finding that a jury question was presented as to the negligence of respondent even though the court acknowledged that Grady was the favored driver on the boulevard, Brown was the unfavored motorist, and that Brown drove his vehicle into the roadway. Petitioners concede that the intermediate appellate court was correct in many ways: that the Boulevard Rule applied to this accident; that Grady was the favored driver; that Brown was the unfavored driver; that Brown had entered the roadway; that Brown was required to yield the right-of-way to Grady; and that Grady had a right to assume that Brown would stop and yield the right-of-way. The court's error, petitioners argue, was that the court considered the speed, time and distance of Grady, the favored driver, in analyzing whether the Boulevard Rule had been violated.

Respondent argues that the intermediate appellate court did not err in holding that petitioners were not entitled to a judgment as a matter of law. Respondent concludes that the court properly applied the Boulevard Rule to the facts of this specific accident.

■ In deciding whether the trial judge should have entered judgment as to liability in favor of the appellants, we examine the facts presented at trial, together with all inferences that can reasonably be inferred from those facts, in the light most favorable to Brown, the non-moving party.. *See* Maryland Rule 2–519(b) (2004). This means that we must accept as true Brown's version as to how the accident occurred and, to the extent that it contradicts Brown's testimony, reject the version testified to by Grady. *See Owens–Corning v. Garrett*, 343 Md. 500, 527, 682 A.2d 1143, 1156 (1996); *Chesapeake Pub. v. Williams*, 339 Md. 285, 294 n. 2, 661 A.2d 1169, 1173 n. 2 (1995).

■ Petitioners' argument is essentially that respondent is negligent as a matter of law because he entered onto the

favored highway, Falkirk Road, when he proceeded past the curb line and moved parallel to the parked cars in order to get a view of the oncoming traffic on Falkirk Road. We do not agree with petitioners and conclude that the Court of Special Appeals ruled correctly that the trial court did not err in declining to grant a Judgment Notwithstanding the Verdict or order a new trial in this case. Moreover, we reject petitioners' argument that the Court of Special Appeals created a new exception to the Boulevard Rule and failed to properly apply the Boulevard Rule in this case. Neither did the court engage in "a calculation of distance (how far was the intrusion) and a calculation of time (how long was he there)." Petitioner's brief at 16.

■■ The Boulevard Rule, while firmly embedded in Maryland law, must be applied with a modicum of common sense. In order to satisfy the rule, respondent was not required to remain at the curb line of the alley *ad infinitum,* where his vision of oncoming traffic was blocked forever, or at least until the parked cars moved. Respondent was not precluded by the Boulevard Rule, after he came to a full stop, from inching up and stopping his vehicle parallel to the parked cars, before he entered the traveled portion of the roadway, in order to get a view of the traffic on the highway.[4] Whether he actually stopped and whose version of the event was to be believed was a jury question—and the jury believed respondent. If the jury believed respondent's version, then the jury was entitled

---

4. The dissent contends that the Boulevard Rule requires that "unfavored drivers … not encroach on a traveled portion of the highway." Dissent op. at 202, 968 A.2d at 1095. The dissent reads a proscription into the Boulevard Rule that does not exist in the plain language of the Md.Code. The crux of the Boulevard Rule as set forth in Md.Code, Transportation Article, § § 21–403, 21–404 and 21–705 is that the unfavored driver must *yield the right-of-way* to the favored driver. The jury apparently believed respondent's testimony that he complied with the Boulevard Rule and yielded the right-of-way by stopping at the curb line first, proceeding to inch forward, and then stopping for a second time without his car protruding beyond the vehicle parked on Falkirk Road and situated to respondent's left. The jury also apparently accepted respondent's testimony over petitioner's testimony and believed that respondent was stopped when the accident happened.

to believe, as it apparently did, that respondent yielded the right-of-way and that the accident was caused by petitioner Grady's fear that respondent might not remain stopped and yield the right-of-way.

The Court of Special Appeals considered a similar issue in *Craig v. Englar*, 11 Md.App. 146, 273 A.2d 224 (1971). In that case, the unfavored driver stopped at a stop sign and then proceeded forward and then stopped again in order to gain an unobstructed view of the oncoming traffic. The court held that the defendant "acted reasonably in stopping, for a second time, beyond the stop sign in order to gain an unobstructed view" of the oncoming traffic. *Id.* at 150, 273 A.2d at 226. The observation of Chief Judge Soboloff in *Rea Construction Co. v. Robey*, 204 Md. 94, 100, 102 A.2d 745, 747 (1954) also applies to the factual conflict presented in this case:

"When the interplay of circumstances is susceptible of different interpretations by rational minds, the problem is essentially one for the jury; the trial judge is not permitted to transform it into a question of law for his own determination. The choice between conflicting facts and the weighing and assessing of competing inferences radiating therefrom is the jury's province."

We agree with the observations of our predecessors, restated in *Racine v. Wheeler*, 245 Md. 139, 147, 225 A.2d 444, 448 (1967), where Judge McWilliams, writing for the Court, stated as follows:

"What Judge Hammond ... ([later] Chief Judge) said in *Harper v. Higgs*, 225 Md. 24, 34, 169 A.2d 661, [665] (1961) can just as appropriately be said here:

'We think the instant case presents one of those rare instances in which the conduct of the favored driver was properly subject to a jury's determination of its reasonableness and prudence under the circumstances.' "

Accordingly, petitioners were not entitled to judgment as a matter of law.

**199**

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.*

Dissenting Opinion by WILNER, J., which BELL, C.J., and HARRRRELL, J., Join.

ALAN M. WILNER, Judge (Retired, specially assigned), dissenting, which BELL, C.J., and HARRELL, J., Join.

But for an admission by the defendant, this would be a more difficult case, because it would expose the tension between maintaining the certainty provided by boulevard rule, as this Court has fashioned it, and the dilemma faced by an unfavored driver when presented with an obstruction that blocks a clear line of sight with respect to traffic on the boulevard. Because of that admission, however, unmentioned and therefore not accounted for by the Court, that dilemma may not really be presented here. Mr. Brown admitted in his testimony that he both saw and heard Mr. Grady proceeding down Falkirk Road, proceeding toward the alley and about two car-lengths away, before he "inched" into the roadway where the collision occurred. This was not a case, then, of his sensory perception, including vision, being actually blocked by the parked truck.

The Court seems to think, nonetheless, that, so long as Brown did not proceed beyond the width of the parked truck, as he testified, there was no violation of the boulevard rule, and, simply because he stopped temporarily further back, he was entitled move forward and to encroach on that part of the roadway without liability, whether or not he was aware of Grady's vehicle. I believe that the Court is wrong in that view, and, with respect, I therefore dissent.[1]

---

1. The Court accuses me of reading a proscription into the boulevard rule "that does not exist in the plain language of the Md.Code." The problem is that it *does* exist in the plain language of the Code. Section 21–403(b) of the Transportation Article requires drivers approaching a through highway to stop "at the entrance to the through highway" and

The Court restates, and seems to confirm, the nature and contour of the boulevard rule as set forth in *Creaser v. Owens,* 267 Md. 238, 239–45, 297 A.2d 235, 236–39 (1972):

"[A] driver upon approaching a 'through highway' from an unfavored road must stop *and yield* the right of way to all traffic already in or which may enter the intersection during the entire time the unfavored driver encroaches upon the

---

to "yield the right-of-way to any other vehicle approaching on the through highway." To appreciate the meaning of that command, one must resort to the relevant definitions, some of which the Court omits even to mention.

Section 11–127 defines "highway," in relevant part, as *"the entire width between the boundary lines of any way or thoroughfare* of which any part is used by the public for vehicular traffic ..." (Emphasis added). Section 21–101(x) defines "through highway" as "a highway or part of a highway on which vehicular traffic is given the right-of-way" and at "the entrances to which vehicular traffic from intersecting highways is required by law to yield the right-of-way to vehicles on that highway or part of a highway, in obedience to either a stop sign or yield sign placed as provided in the Maryland vehicle law." Section 21–101(*l*) defines "intersection," in relevant part, as "the area within the prolongation or connection of the lateral curb lines or, in the absence of curbs, the lateral boundary lines of the roadways of two highways that join at or approximately at right angles." The term "roadway" is defined in § 11–151 as "that part of a highway that is improved, designed, or ordinarily used for vehicular traffic, *other than the shoulder.*" (Emphasis added). "Shoulder" is defined in § 21–101(v) as "that portion of a highway contiguous with the roadway for the accommodation of stopped vehicles, for emergency use, and for the lateral support of the base and surface courses of the roadway."

As I interpret these various definitions, the area where the collision in this case occurred was *not* a shoulder, but was part of the roadway, and therefore was within the "intersection." It was also within the boundary lines of Falkirk Road, and thus part of that highway, and was within the prolongation of curb lines or the lateral boundary lines of Falkirk Road and, for that reason as well, was within the intersection. Brown had a duty not to enter that intersection or the roadway until assured that it was safe to do so, and that included the area in front of the parked truck.

The Court seems to believe that any portion of a highway on which parking is allowed is not "improved, designed, or ordinarily used for vehicular travel," and that simply is not so. For one thing, parked cars must normally travel some distance in the very lane reserved for parking in order to park and to get back into the flow of traffic. That space is necessarily part of the roadway and the highway, as defined in the statute. Had Grady intended to turn into the alley, he would have

right of way; [and] this duty continues as long as he is in the intersection and until he becomes a part of the flow of favored travelers or successfully traverses the boulevard." (Emphasis added).

\* \* \* \*

"In none [of the more than fifty opinions of the Court that have considered the boulevard rule] has there been any suggestion *that the topography of an area which limits an unfavored driver's view of travelers on the favored highway would relieve him of the heavy responsibility placed on him by the stringent requirements of this law.*" (Emphasis added).

\* \* \* \*

"The essence of [this Court's] decisions, when distilled to their purest form, leaves no doubt that the duty of the unfavored driver to yield the right of way extends to traffic on the whole of the favored road *and the driver on the favored highway has a right to assume that he will do so.*" (Emphasis added).

\* \* \* \*

"In order to make crystal clear our holding here, we emphasize that if an unfavored driver is involved in an accident with a favored driver under circumstances where the boulevard law is applicable then in a suit based on that collision the unfavored driver is deemed to be negligent as a matter of law."

Having stated that rule, which the Court agrees is "firmly embedded in Maryland law," the Court, in the guise of applying it "with a modicum of common sense," proceeds to dismantle it by permitting the unfavored driver, after stopping, to "inch[ ] up" to "the traveled portion of the roadway, in order to get a view of the traffic on the highway." But for the laws of physics that might be a workable solution.

---

had to pass through that part of the roadway to do so. With respect, it is the Court that misconstrues the statute.

The problem is that most passenger cars and many trucks, at least at present, are designed so that the driver is sitting several feet behind the front of the vehicle. In order for the driver to advance far enough see around the corner, if there is an obstruction, the front of the vehicle will ordinarily be well into the traveled portion of the roadway, thereby encroaching on the favored driver's right of unimpeded passage. If, as we held in *Creaser,* a limitation of the unfavored driver's view of traffic on the highway caused by the *topography* of the area does not relieve that driver of the stringent requirements of the law, surely a parked vehicle on the highway will not provide that relief.

There *is* a dilemma if, in fact, the unfavored driver's line of sight is obstructed, thereby impeding his or her ability to know whether traffic is approaching on the favored highway. It is not one that would require the unfavored driver "to remain at the curb line of the alley *ad infinitum,*" however, as the Court supposes, but rather one that simply calls for allocating rights and duties. If the law, for good reason, gives the favored driver the right to proceed, secure in the knowledge that unfavored drivers will yield the right of way and not encroach on a traveled portion of the highway, then unfavored drivers must, in fact, yield the right of way and not encroach on a traveled portion of the highway. If they fail to yield and do encroach, they will ordinarily be held to have violated the law and, subject to any proper defense they may have, such as contributory negligence, assumption of the risk, or last clear chance, they will ordinarily be responsible for any harm they cause. If this seems somehow unfair to the unfavored driver, the rule adopted by the Court today is going to be at least equally unfair to the favored driver, who will no longer be able to assume that the bumpers and hoods of unfavored vehicles will not suddenly and without warning protrude into their lane of travel.

This is not, as the Court indicates, one of those "rare instances in which the conduct of the favored driver was properly subject to a jury's determination of its reasonableness and prudence under the circumstances." Situations of

this kind occur every day throughout the State, especially in urban and suburban areas where obstructions of one kind or another at or near intersections are commonplace. What the Court has done is to drive a huge wedge through a clear rule that is indeed "firmly embedded in Maryland law" and that ought to remain so.

Mr. Brown may well have done what he thought, and what many people might think, was reasonable under the circumstances. Negligence is a matter of duty, however, and the law imposed a duty on him not to encroach on to Falkirk Road until he was certain that there was no oncoming traffic on that road. Under either version of what occurred, the accident happened because he did encroach on the traveled portion of that road. He was on the roadway itself, not a shoulder, and he had no right to be there. I would therefore reverse the judgment of the Court of Special Appeals and remand with instructions to reverse the judgment of the Circuit Court.

I am authorized to state that Chief Judge BELL and Judge HARRELL join in this dissent.